**James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,**

**v.**

**Ole SINGSTAD and David G. Baillie, Jr., Individually and as Partners doing business as Singstad & Baillie,**

**and**

**Robert O. Bonnell, Chairman, Edgar T. Bennett and John J. McMullen, Constituting the State Roads Commission of Maryland, acting for and on behalf of the State of Maryland, Defendants.**

**Civil No. 10050.**

United States District Court
D. Maryland.

Sept. 28, 1959.

See also 23 F.R.D. 62.

Ernest N. Votaw, Regional Atty., and Louis Weiner, Atty., U. S. Dept. of Labor, Chambersburg, Pa., Stuart Rothman, Sol. of Labor, John J. Babe, Asst. Sol., and James M. Miller, Washington, D. C., for plaintiff.

A. Victor Cherbonnier, New York City, Theodore Sherbow, James J. Doyle, Jr., and Sherbow & Sherbow, Baltimore, Md., for Singstad & Baillie.

C. Ferdinand Sybert, Atty. Gen. of Maryland, Joseph D. Buscher, Sp. Asst. Atty. Gen., and Charles C. Seymour, Special Atty., Baltimore, Md., for State Roads Commission of Maryland.

THOMSEN, Chief Judge.

This is an action brought by the Secretary of Labor in September, 1957, to enjoin the defendants, Ole Singstad and David G. Baillie, Jr., individually and as partners doing business as Singstad & Baillie, from violating the overtime and record-keeping provisions of the Fair Labor Standards Act of 1938, as amended (29 U.S.C.A. §§ 207, 211(c)). No request is made for a money judgment. Singstad & Baillie are consulting engineers who, under contract with the State Roads Commission of Maryland (Commission) had designed and were supervising the construction of a vehicular tunnel under the Patapsco River in Baltimore Harbor. The Commission was permitted to intervene as an additional defendant.

The principal questions presented are:

I. Whether the employees of Singstad & Baillie were excluded from coverage (a) because the tunnel project was "new construction", or (b) on the ground that Singstad & Baillie "represented" the Commission and therefore were entitled to the benefit of the exclusion from the Act of "States or political subdivisions of a State".

II. Whether (a) the controversy is moot; or (b) the court should exercise its discretion to refuse an injunction.

### Facts [1]

#### The Project

The practicability of a highway crossing the Patapsco River in Baltimore Harbor by bridge or tunnel had been discussed for many years. In 1953, after preliminary traffic and engineering investigations, the Commission developed

---

[1]. More detailed findings, as requested by the several parties, have been filed with the Clerk.

the Patapsco River Tunnel Project (also known as the Baltimore Harbor Tunnel Project), comprising a two-tube tunnel under the Patapsco River from Canton to Fairfield, in Baltimore City, and approaches connecting the tunnel with heavily traveled interstate highways which pass through Baltimore City.[2] The overall length of the facility is 15.2 miles, of which 1.7 miles are tunnel and open depressed ramps adjacent to the tunnel. The major purpose of the Patapsco River Tunnel was to permit the easier flow of interstate traffic by relieving the congestion in the streets of Baltimore around the head of the Harbor.[3] The local traffic value of a direct highway link between the two waterfront industrial areas was also a factor in the decision to build the tunnel.

### The Relationship between the Commission, Greiner and Singstad & Baillie

In the ordinary operations of the Commission, its employees design the highways which it builds, prepare the plans and specifications, and supervise the construction. When its work is unusually heavy, the Commission sometimes engages outside engineering firms to prepare detailed studies, designs, plans and specifications for particular highways. In such cases, however, the Commission customarily retains complete and exclusive control of the project.

The Patapsco River Tunnel Project was an exceptional undertaking for the Commission. It was financed entirely by the proceeds of revenue bonds, issued under Chapter 561 of the Acts of Maryland of 1947, as amended by Chapter 41 of the Acts of 1947, Extraordinary Session, Maryland Code, 1951 ed., Art. 89B, §§ 106–126, 1957 ed., Art. 89B, §§ 120–140. The trust agreement under which the bonds were issued provided that payments from the construction fund (except payments of interest) should be made only with the approval both of the Commission and of J. E. Greiner Company (Greiner), the "Consulting Engineer". Greiner's duties included the issuance of engineering directives, the approval of completed construction contract plans and specifications, and the coordination of the inspection of construction. The Deputy Chief Engineer of the Commission served as the liaison between Greiner and the Commission. His duties included the review of all contractors' estimates recommended for payment by the Consulting Engineer (Greiner).

The Commission had no one on its staff competent to design or supervise the construction of the projected tunnel. The Commission, therefore, entered into a contract with Singstad & Baillie, dated June 3, 1954, under which Singstad & Baillie undertook to design, prepare the plans and specifications for, and supervise the construction of the tunnel proper, the adjacent ramps, the service building, and two emergency garages near the tunnel entrances, all subject to the authority of the Consulting Engineer (Greiner). Singstad & Baillie's contractual obligations and authority were limited to the 1.7 miles from grade point to grade point.

The general specifications for the Tunnel Project, under the heading "Definitions", stated: "Consulting Engineer—J. E. Greiner Company, the representative of the Commission duly authorized to control and coordinate the work performed under the various construction sections." Singstad & Baillie were referred to as the "Contracting Engineer", a misleading term, but their function was clearly stated as follows: "In the performance of the Work, the Contract-

2. The approaches connected the tunnel with U.S. 1, near Elkridge, Maryland, west of Baltimore; with the Baltimore-Washington Expressway; with Alternate U.S. 301, south of Baltimore; and with U.S. 40, leading north and east, near the eastern boundary of the City.

3. The streets in Baltimore City which were involved in this heavy flow of interstate traffic included Light Street and Hanover Street—U.S. 301 and Md. 2; Washington Boulevard—U.S. 1; Pratt Street, Lombard Street, Fayette Street, Franklin Street, Orleans Street and Mulberry Street—U.S. 40.

ing Engineer is the direct representative of the Commission, subject to coordination and direction by the Consulting Engineer. All activities, documents, and materials initiated by the contractor which concern the Work and which require approval or action by the Commission shall be submitted to the Contracting Engineer and will be processed through the Consulting Engineer to the Commission."

During the construction, the representatives of Singstad & Baillie gave orders to the contractors who were performing that part of the work which Singstad & Baillie had designed. Such orders were usually given after consultation with a representative of Greiner who had been designated for that purpose. Objections by the contractors to such orders were heard by representatives of Singstad & Baillie, Greiner and the Commission, meeting together. Claims presented by contractors engaged in the construction of the tunnel proper were presented to Singstad & Baillie for processing to the Commission. Recommendations as to the action to be taken on such claims were made by Singstad & Baillie and forwarded to Greiner, who, together with the Commission, decided what action should be taken. The work, designs and orders of Singstad & Baillie were usually, perhaps always, approved by Greiner and by the Commission. Singstad & Baillie were independent contractors, with specified, limited authority.

A consideration of all the documents and evidence shows that the Commission retained all of its authority except as it was modified by the provisions of the trust agreement which required the concurrence of the Consulting Engineer (Greiner) for certain purposes.

### Singstad & Baillie's Operations

Singstad & Baillie are design engineers, having their principal offices in New York City. Since 1951 they have been engaged in the design (including preparation of plans and specifications for construction) of vehicular tunnels for state highway departments, turnpike commissions, municipalities, and other public bodies. They regularly employ in their New York offices engineers, designers and draftsmen. Although the evidence on the question was meagre, it appears that some of these employees are not "professional employees" within the meaning of 29 U.S.C.A. § 213; Reg. 29 U.S.C.A.Appendix, § 541.3.

The contract with the Commission was unique so far as Singstad & Baillie were concerned, because they had never theretofore agreed to supervise the construction of a tunnel. Such supervision is customarily undertaken by the public authority, using its own employees, who may consult with the partners or professional employees of Singstad & Baillie. In the case of the Patapsco Harbor Tunnel, however, Singstad & Baillie themselves employed the inspectors, field clerks, rodmen, chainmen, and others, who performed nonprofessional work at the site; they also had some professional employees at the site. Singstad & Baillie opened an office in Baltimore; their top men visited Baltimore from time to time, and kept in touch by telephone with the men in the field, who sent periodic written reports to the New York office.

The provision that Singstad & Baillie prepare the plans and specifications was normal for them. Ole Singstad and other engineers at the top of the organization originated the ideas for the tunnel and passed them on to other engineers, chief draftsmen and group leaders; they, in turn, passed them down the line to designers and draftsmen, who, under supervision, worked on details of the plan.

The wages, salaries or other compensation of all of Singstad & Baillie's employees in New York and at the site in Baltimore were fixed and paid by Singstad & Baillie, who also determined their hours of work. Those employed in Maryland were insured under the Maryland Workmen's Compensation Law by a policy issued to Singstad & Baillie. None of the employees of Singstad & Baillie was covered under the Employees' Retirement System of the State of Maryland, nor were any of the employees of Singstad &

Baillie hired, fired or controlled by the Commission or any other agency of the State of Maryland. Singstad & Baillie have been registered with the Department of Employment Security, State of Maryland, since June, 1954, and paid "unemployment" taxes on their employees in Maryland.

The non-professional employees .of Singstad & Baillie at the site in Baltimore sometimes worked more than forty hours in a work week, and were not paid by Singstad & Baillie in accordance with the provisions of 29 U.S.C.A. § 207. Moreover, daily and weekly records of the hours worked by those employees were not maintained by Singstad & Baillie in accordance with the regulations issued by the Administrator of the Wage and Hour Division, pursuant to 29 U.S.C.A. § 211.

Actual work on the Harbor Tunnel Project began in 1955, and was substantially completed on November 29, 1957; thereafter no further work was done on the project by Singstad & Baillie. The wage and hour investigation covered the period from· February, 1955, through February, 1957. The complaint in this action was filed on September 26, 1957.

The men employed by Singstad & Baillie at the site in a non-professional capacity had not theretofore been regular employees of Singstad & Baillie. When their work was completed they left the employ of Singstad & Baillie, and it is not contemplated that they will be re-hired.

Singstad & Baillie does not intend to do any further supervisory work with their own employees, but cannot say that they will never do so if the proposition is sufficiently attractive. In connection with a tunnel project in Florida, on which they are now engaged, they have agreed to furnish professional engineers to consult with the employees of the public authority who are supervising construction.

## Discussion

### I.

Some of the designers or draftsmen employed by Singstad & Baillie in their New York office appear not to have been "professional employees", and some of the inspectors, field clerks, and others who worked at the tunnel site in Baltimore certainly were not "professional employees". Since the decision of the Supreme Court in Mitchell v. Lublin, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243, it is clear that such employees were engaged in commerce and were within the coverage of the Act unless, as defendants contend, (A) they were excluded by the "new construction" rule, or (B) Singstad & Baillie are entitled to the benefit of the exclusion from the Act of "States and political subdivisions of States".

### A.

For some years after the decision of the Supreme Court in Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656, it was generally held that employees engaged in the repair or reconstruction of existing roads and bridges which carried a volume of interstate traffic were engaged "in commerce" within the meaning of the Act, but that employees engaged in the original construction of roads, bridges, etc. were engaged in a local activity and were not engaged "in commerce", even though the roads and bridges were to be integrated later into an interstate highway system. See e. g. Reed v. Murphey, 5 Cir., 168 F. 2d 257, certiorari granted and judgment vacated 335 U.S. 865, 69 S.Ct. 105, 93 L.Ed. 410; Van Klaveren v. Killian-House Co., 5 Cir., 210 F.2d 510, 43 A.L.R.2d 885; Koepfle v. Garavaglia, 6 Cir., 200 F.2d 191; Crabb v. Welden Bros., 8 Cir., 164 F.2d 797; Moss v. Gillioz Const. Co., 10 Cir., 206 F.2d 819. The Fourth Circuit recognized the so-called "new construction" rule, but refused to apply it in the case of a watchman employed by a contractor engaged in constructing a new bridge to replace a bridge which was part of an interstate highway. Bennett v. V. P. Loftis Co., 4 Cir., 167 F.2d 286.

The new construction rule received a severe if not a fatal blow from the Supreme Court in Mitchell v. C. W. Vollmer

& Co., 349 U.S. 427, 75 S.Ct. 860, 99 L. Ed. 1196, where the Court, refusing to follow an F.E.L.A. case [4] which had applied the new construction rule, said: "We are dealing with a different Act of another vintage—one that has been given a liberal construction from Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, to Alstate Construction Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745. The question whether an employee is engaged 'in commerce' within the meaning of the present Act is determined by practical considerations, not by technical conceptions. See Walling v. Jacksonville Paper Co., 317 U.S. 564, 570, 63 S.Ct. 332, 336, 87 L.Ed. 460; Overstreet v. North Shore Corp., 318 U.S. 125, 128, 130, 63 S.Ct. 494, 496, 497, 87 L.Ed. 656. The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity. See McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538. Repair of facilities of interstate commerce is activity 'in commerce' within the meaning of the Act as we held in Fitzgerald Const. Co. v. Pedersen, 324 U.S. 720, 65 S.Ct. 892, 89 L.Ed. 1316. And we think the work of improving existing facilities of interstate commerce, involved in the present case, falls in the same category." 349 U.S. at pages 429, 430, 75 S.Ct. at page 862.

Shortly thereafter the Eighth Circuit questioned how far Vollmer had "changed or eliminated" the new construction rule, Chambers Const. Co. v. Mitchell, 8 Cir., 233 F.2d 717, 721. But within a week after Chambers the Supreme Court said, by way of dictum in an F.E.L.A. case: "This Court recently rejected the 'new construction' doctrine in determining whether an employee is 'engaged in commerce' within the meaning of a like provision in the Fair Labor Standards Act." Southern Pacific Co. v. Gileo, 351 U.S. 493, 500, 76 S.Ct. 952, 957, 100 L.Ed. 1357. Since Gileo, the

Fifth Circuit has decided Archer v. Brown & Root, Inc., 241 F.2d 663, a case dealing with a new causeway built across Lake Pontchartrain to relieve the overburdened highways on the south side of the lake and to facilitate the flow of traffic in and out of New Orleans. The Court said:

"Whether, prior to Vollmer, this project, physically isolated by considerable distance from the established facilities of which it was to be a functional part, would have been considered an improvement of an existing facility may have been open to considerable doubt, especially as to those within the geographical reach of our pronouncements, see Van Klaveren v. Killian-House Co., 5 Cir., 210 F.2d 510, [43 A.L.R.2d 885] (deemed overruled by the dissenters in Vollmer). But Vollmer does, we think, at least do this much: in the emphasis to be given 'practical considerations' if it is plain that the project, when completed, is intended to and will serve as an important, definite addition to, or improvement of, existing identifiable instrumentalities and thus facilitate the flow of commerce, whether by savings in time, or distance, elimination of costly delays or obstacles, or by an infinite variety of other causes, then mere physical isolation, separation of the project from the point or points of its ultimate connection with existing facilities or the necessity for a *future* connection will not be decisive.

"That it would be a link in the existing interstate system was indispensable to the planning, execution, financing and operation of this Expressway. Thus it was, within the teaching of Vollmer, 'so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity * * *,'

4. Raymond v. Chicago, M. & St. P. R. Co., 243 U.S. 43, 37 S.Ct. 268, 61 L.Ed. 583.

349 U.S. at page 429, 75 S.Ct. at page 862, 99 L.Ed. at page 1200." 241 F.2d at page 667.

The instant case is remarkably similar to Archer. The tunnel project was intended to serve as an important, definite addition to or improvement of existing identifiable instrumentalities (the highways through Baltimore City referred to above) and thus facilitate the flow of commerce by savings in time and distance, by the elimination of costly delays and bottlenecks, and by a variety of other means.

■ Defendants argue that the tunnel, 1.7 miles from grade point to grade point, should be considered by itself, apart from the approaches or the project as a whole. This contention is without merit. "If the declared purpose of the Act is to be accomplished, a project should be considered as a whole, in a realistic way; not broken down into its various phases so as to defeat the purpose of the Act." Bennett v. V. P. Loftis Co., supra, 167 F.2d at page 288.

The new construction rule offers no shelter to defendants in the instant case.

### B.

■ Sec. 3(d) of the Act, 29 U.S.C.A. § 203(d), provides that the term "employer" shall not include "the United States or any State or political subdivision of a State". Defendants argue that Singstad & Baillie were acting for and on behalf of the Commission "on all phases of the 1.7 miles from grade point to grade point", not as an independent contractor but as "agent" of the Commission; that Singstad & Baillie "had the general authority and responsibility of the Commission and was in fact its alter ego"; and that, therefore, "occupying the position of the Commission on this phase of the project places Singstad and Baillie in the position of being exempt from the provisions of the Act."

This argument is not supported either by fact or law. The terms "agent" and "independent contractor" are not mutually exclusive. Restatement of Agency, 2d ed., sec. 2. Singstad & Baillie were independent contractors, who acted on behalf of the Commission as its agent for certain purposes, namely, the design of the tunnel, the preparation of plans and specifications, and the supervision of construction. Singstad & Baillie were not agents of the Commission for the purpose of hiring employees of the Commission. The inspectors, field clerks, linemen, and others were the servants (employees) of Singstad & Baillie. They were hired, fired, controlled and directed by Singstad & Baillie, and were treated as the employees of Singstad & Baillie for purposes of the workmen's compensation law and the unemployment security law. Neither Singstad and Baillie nor their employees became servants of the Commission.[5]

Defendants have cited no authority which holds that Singstad & Baillie are exempt from the provisions of the Act under these circumstances. More or less analogous cases hold the contrary. Magann v. Long's Baggage Transfer Co., D.C.W.D.Va., 39 F.Supp. 742, 747, Barksdale, J.; Thompson v. Daugherty, D.C. D.Md., 40 F.Supp. 279, 282, Chesnut, J.; Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017; Walling v. Patton-Tulley Transp. Co., 6 Cir., 134 F.2d 945, 949; Walling v. McCrady Construction Co., D.C.W.D.Pa., 60 F.Supp. 243, 245, affirmed 3 Cir., 156 F. 2d 932.

### II.

### A.

■ It has long been recognized that "the court is not * * * to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it." People of State of California v. San Pablo & T. R. Co., 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747. On the other hand, in Wall-

5. Nothing said herein is intended to imply that Greiner became the alter ego of the Commission or was exempt from the provisions of the Act.

ing v. Haile Gold Mines, 4 Cir., 136 F.2d 102, Judge Dobie said: "It is familiar law that the discontinuation of an illegal practice by a defendant (either by going out of business or otherwise) after the institution of legal proceedings against the defendant by a public agency, does not render the controversy moot. * * * This particularly is true where the challenged practices are capable of repetition. * * * Nor is a case rendered moot where there is a need for the determination of a question of law to serve as a guide to the public agency which may be called upon to act again in the same matter. * * *" 136 F.2d at page 105. See also Avery v. Wichita Falls Independent School Dist., 5 Cir., 241 F.2d 230, 234; Fleming v. Phipps, D.C.D.Md., 35 F. Supp. 627, 630, Chesnut, J.; McComb v. Homeworkers' Handicraft Cooperative, 4 Cir., 176 F.2d 633, 641.

■ Singstad & Baillie continued to employ a few non-professional employees in Maryland at the tunnel site .after the instant suit was filed. In the normal course of their operations in their New York office, they still employ some designers and draftsmen who may be non-professional employees. Neither defendant has conceded that the new construction rule does not apply in this case, or in other similar cases on which Singstad & Baillie have been working or will work in the future. The case is not moot, and injunction is a proper remedy. Mitchell v. Lublin, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243.

### B.

■ Whether an injunction shall issue in a particular case rests in the sound discretion of the court. Mitchell v. Chambers Construction Co., 10 Cir., 214 F.2d 515; Chambers Construction Co. v. Mitchell, 8 Cir., 233 F.2d 717; Mitchell v. Hodges Contracting Co., 5 Cir., 238 F. 2d 380; Mitchell v. Empire Gas Engineering Co., 5 Cir., 256 F.2d 781. See also McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599; United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303. "The purpose of an injunction in a case of this kind is to prevent future violations in the public interest, not to punish for past transgressions." Mitchell v. Chambers Construction Co., 10 Cir., 214 F.2d 515, 517.

■ I am satisfied that Singstad & Baillie have been acting in good faith, under the advice of counsel. Until the decision of the Fifth Circuit in the Lake Pontchartrain case in 1958 and the decision of the Supreme Court in Lublin, in 1959, there was room for doubt about the issues involved in this case. The position of Singstad & Baillie was supported by the Attorney General of Maryland.

At a hearing on the question whether an injunction should issue, counsel for Singstad & Baillie stated that their clients will in the future keep the records required by the Act and will pay non-exempt employees in accordance with the provisions of the Act. They also said that they will pay, in accordance with the requirements of the Act, the past claims of all non-exempt employees against which limitations had not run on September 22, 1959. Counsel stated, however, that only one of the employees in the New York office is a non-professional employee; they contend that most routine drafting is done by graduate engineers, many of them with European degrees, who are not qualified to practice as engineers in the United States. It is hard to believe that a firm as large as Singstad & Baillie can operate with only one non-professional employee, a secretary. However many degrees a person may have, if he does routine work under supervision or other work which does not qualify as professional work under the test provided by the statute, he is a non-professional employee.

■ I shall enter a customary decree embodying the conclusions set out in this opinion and enjoining Singstad & Baillie from further violations of the Act, but will suspend the operation of the injunction unless and until it is made clear that Singstad & Baillie will not voluntarily comply with all the provisions of the Act, including the payment of all proper claims not barred by limitations on Sep-

tember 22, 1959. The government may move at any time more than thirty days and less than three years after the date of such decree for an order removing the suspension of the operation of the injunction.

Counsel for plaintiff will prepare an appropriate decree.