SELMA HEASLEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3044–63, 1240–64.   Filed February 21, 1966.

Selma Heasley, pro se.

*Donald W. Wolf*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income tax for the calendar years 1959 and 1960 in the amounts of $3,745.64 and $1,433.40, respectively.

The issues for decision are:

(1) Whether for the calendar year 1959 petitioner is entitled to a loss carryover in excess of the amount allowed by respondent.

(2) Whether, to the extent of $2,387.51, the deficiency in income tax determined by respondent for the year 1959 constituted a deficiency at the date the notice was issued.

(3) Whether petitioner derived income from the sale of grain in the amount of $7,183.06 in the calendar year 1960.

(4) Whether for the taxable years 1959 and 1960 petitioner filed a joint income tax return with her husband and should therefore be entitled to compute her tax on the basis of a joint return.

FINDINGS OF FACT

Petitioner and Fay Heasley are, and were during the taxable years 1959 and 1960, husband and wife living together with their residence in Eldridge, N. Dak.

For the taxable year 1959 a U.S. Individual Income Tax Return on Form 1040 was filed in the name, "Fay and Selma Heasley," Eldridge, N. Dak., with the district director of internal revenue for the district of North Dakota, on or about April 8, 1960. This return was signed by Fay Heasley and by petitioner, and in the space for the signature of preparer other than taxpayer appeared a signature, "A. F. Schirber" with an address in Jamestown, N. Dak. The income and deductions reported on the return were contained on schedules, each headed, "Fay & Selma Heasley."

For the taxable year 1960 an income tax return on Form 1040 bearing the name, "Fay and Selma Heasley," % Henry W. Anderberg, Jamestown, N. Dak., was filed with the district director of internal revenue on or about June 1, 1962. In the space provided for signature of preparer other than taxpayer appeared the name, "A. F. Schirber" with the same address in Jamestown, N. Dak., as shown on the 1959 return. Directly beneath the signature of the preparer of the return was typed the following:

The above taxpayers have refused to execute the enclosed return and therefore under authority granted me as Receiver in the matter of U.S.A. vs. Heasley, Civil No. 3602, and the request of Director of Internal Revenue, I hereby submit the following tax return based solely upon the information obtained from IRS and taxpayers' accountant. Henry W. Anderberg

One schedule attached to this return bore the caption, "Fay Heasley, Eldridge, N. Dak., Farm Income Schedule Year ended December 31, 1960." The income reported on this schedule consisted of the following:

| | |
|---|---:|
| Grain sales | $7, 183. 06 |
| Livestock sales | 4, 167. 26 |
| Gas tax refund | 326. 00 |
| Co-op dividends | 255. 00 |
| | 11, 931. 32 |

From this was subtracted itemized expense deductions totaling $9,942.26, leaving a balance of $1,989.06, to which was added an amount of $236.84 under the caption, "Excess Depreciation Claimed," making a total of $2,225.90. On a separate schedule entitled, "Henry W. Anderberg Receiver for Fay Heasley, Eldridge, North Dakota," there appeared the following amounts as income:

| | |
|---|---:|
| Grain sales | $62, 427. 37 |
| Livestock | 43. 10 |
| Co-op dividend | 2, 990. 71 |
| | 65, 461. 18 |

From this amount of $65,461.18, itemized expenses of $56,158.52 were deducted, leaving a net amount of $9,302.66.

Under the title, "Capital Gains Schedule," the following appeared:

| Description | Dates | S. price | Cost | Deprec. | Gain |
|---|---|---|---|---|---|
| Farm land & bldgs | 1934–1960 | $225,300.00 | $176,353.54 | $33,824.68 | $82,771.14 |
| Profit ratio___$82,771.14÷$225,300.00=36.74% | | | | | |
| Down payment received in 1960: $45,300.00×.3674 | | | | 16,643.22 | |
| Taken into account 50% | | | | 8,321.61 | |

The item of $2,225.90 reported under the designation, "Fay Heasley * * * Farm Income Schedule," and the two items of $9,302.66 and $8,321.61 reported under the designation, "Henry W. Anderberg Receiver for Fay Heasley," comprise the $19,850.17 reported as income on page 1 of the return on which the tax of $4,481.06 shown on the face of the return was computed. The only schedules other than the two above referred to contained in this return were depreciation schedules, one of which bore the designation "Fay Heasley Eldridge, North Dakota Depreciation Schedule January 1–March 31, 1960," and the other, "Selma Heasley Et Al., Eldridge, North Dakota Depreciation Schedule April 1–December 31, 1960," with a total depreciation under a column entitled, "This Year" of $7,038.94 being shown, which was followed by a statement "¼ share Selma Heasley $1,759.76."

The records of respondent's district director of Fargo, N. Dak., show on the certificate of assessments and payments, under the name of Fay and Selma Heasley of Eldridge, N. Dak., the following entries with respect to income tax for the years 1959 and 1960:

| Tax-able period | Account number | Received or sched-uled date | Description | Liability and (abate-ment) | Pay-ments and credits applied | Balance | Supplemental information |
|---|---|---|---|---|---|---|---|
| 1959 | ME–77–62_____ | 6/12/62 | Tax_____ | $2,387.51 | | | Assessed 6/15/62. First notice 6/15/62. TDA issued 7/24/62. |
| | | | Interest to 6/15/62__ | 310.38 | | | |
| | | 8/29/62 | Abatement 62 C 78. | | $60.42 | | |
| | | 8/29/62 | Credit 62 CB C3__ | | 2,207.51 | | |
| | | 12/28/62 | Interest_____ | 5.78 | | | |
| | | 12/28/62 | Payment_____ | | 435.74 | $0.00 | |
| | | 4/15/63 | Reverse abate-ment. | | (60.42) | | |
| | | 4/15/63 | Reverse credit____ | | (2,207.51) | 2,267.93 | |
| 1960 | DP 10139–62___ | 6/12/62 | Tax_____ | 4,697.06 | | | Assessed 6/15/62. First notice 6/15/62. TDA issued 7/24/62. |
| | | | Penalty 6651_____ | 1,174.27 | | | |
| | | | Interest to 6/15/62__ | 328.79 | | | |
| | | 8/29/62 | Abatement 62 C 78. | | 1,174.27 | | |
| | | 8/29/62 | Abatement 62 C 78. | | 122.64 | | |
| | | 8/29/62 | Credit 62 CB C3__ | | 4,481.06 | | |
| | | 12/28/62 | Interest_____ | 6.94 | | | |
| | | 12/28/62 | Payment_____ | | 429.09 | | |
| | | 6/18/63 | Reverse credit_____ | | (4,481.06) | | |
| | | 11/14/63 | Abatement 63 124__ | | 4,910.15 | 429.09 | Credit. |

There is stamped on the face of the return filed for the year 1959 in the name of Fay and Selma Heasley a notation of assessment under date of June 15, 1962, of tax of $2,387.51 and interest of $310.38 making a total of $2,697.89 with the account number given as ME 77.

On or about August 29, 1962, there was issued by the district director of internal revenue at Fargo, N. Dak., on U.S. Treasury Form 7780–B a notice of allowance of tentative carryback adjustment, which indicated an allowance of a carryback from the year 1961 to the year 1959 for account No. 25–2017884–60 [1] in the amount of $2,207.51 to be credited to account No. ME 77–62. The schedule number shown on the form was 62–CB–C3 and the name and address of taxpayer was given as Henry W. Anderberg, Receiver for Fay and Selma Heasley, Box 918, Jamestown, N. Dak.

The amount of $435.74 shown on respondent's certificate of assessments and payments as having been paid on December 28, 1962, was paid by a check out of the depositary of the receiver with the U.S. District Court, the total check being in the amount of $864.83, and the explanation given on the record of the depositary under the title, "U.S.A. vs. Fay Heasley, et al.," being as follows:

Ck #2480—Director of internal revenue for the district of North Dakota—
   $435.74—Balance due 1959 income tax
   429.09—Balance due 1960 income tax
   ───────
   864.83

Other than the return filed by Henry W. Anderberg as receiver there was no document purporting to be a Federal income tax return for the calendar year 1960 filed in the name of petitioner.

Under date of May 22, 1958, the United States of America commenced an action in the U.S. District Court for the District of North Dakota, Southeastern Division, against Fay Heasley, Selma Heasley, Bob Hendrix, Arley Herr, Paul Heasley, and certain banks and businesses which were alleged to hold assets of Fay Heasley for foreclosure of its liens for Federal taxes for the years 1944 through 1949. In this complaint it was stated that the action had been authorized by the Commissioner of Internal Revenue and the complaint prayed for the appointment of a receiver to enforce the liens of the United States against Fay Heasley.

Paul Heasley is the son of petitioner and Fay Heasley, and Bob Hendrix and Arley Herr are their sons-in-law.

By order dated July 30, 1958, the District Court appointed a receiver for all the assets, real property, personal properties, and rights to properties of Fay Heasley. The receiver was authorized, upon his qualification, to take and keep exclusive control, possession, and custody of the assets, real property, personal properties, and rights to property of Fay Heasley and to conduct, manage, and conserve the

---

[1] This is the number assigned to the Form 1040 filed in the name of Fay and Selma Heasley for the year 1959.

properties and also to receive and control any and all sums due and owing to Fay Heasley in any manner whatsoever, whether then due or thereafter becoming due, and to do such things and enter into such agreements in connection with the management, care, and conservation of the properties of Fay Heasley as he deemed advisable and to incur such necessary expenses and make such necessary disbursements under the court order as were reasonable and necessary. Under this order the receiver had no power to sell any assets or properties of Fay Heasley except upon application to the court and due notice to all interested parties pending final determination by the Tax Court of the United States or the District Court of the merits of the tax liabilities asserted against Fay Heasley.

On August 18, 1958, the District Court discharged the receiver appointed on July 30, 1958, and appointed a new receiver, Henry W. Anderberg, with all of the powers of the former receiver, who qualified as receiver and took possession of all properties he considered as belonging to Fay Heasley.

On April 4, 1959, an order was entered by the U.S. District Court of the District of North Dakota in the proceeding of the United States of America vs. Fay Heasley and the other defendants in which it was determined that the United States was entitled to recover from Fay Heasley the sum of $198,198.92 plus interest from December 29, 1958. In this order the court held that certain real properties were owned solely by Fay Heasley and two other real properties were owned by Fay Heasley and petitioner as joint tenants. The judgment and decree of April 4, 1959, was entered in accordance with a memorandum opinion of the court filed on March 6, 1959, in which memorandum opinion it was recited that the matter had been tried, with the various parties represented by counsel, and that petitioner, Paul Heasley, Arley Herr, and Bob Hendrix had at the trial made claims to certain of the lands shown to be in the name of Fay Heasley, but that there was no adequate proof of such claims. The court also discussed the claims of petitioner, Paul Heasley, Arley Herr, and Bob Hendrix to the 1958 crop grown upon the land and in the memorandum opinion stated:

The Court recognizes that Paul Heasley, Hendrix and Herr may well be entitled to compensation for work, labor and perhaps materials furnished in the sowing and reaping of the 1958 crops, and any claim filed by them with the receiver for Fay Heasley will be heard by the Court as promptly as circumstances permit. The Court believes that under the circumstances of this lawsuit Fay Heasley employed Paul Heasley, Bob Hendrix, and Arley Herr. No other conclusion is tenable.

In the order of April 9, 1959, the court determined that the real estate described in that order, both that owned solely by Fay Heasley and that owned jointly by Fay Heasley and petitioner, could be sold

by the receiver and the proceeds of all the real estate owned solely by Fay Heasley and one-half of the proceeds of the real estate owned jointly by petitioner and Fay Heasley applied in satisfaction of the Federal tax liabilities outstanding against Fay Heasley, and the other one-half of the proceeds of the jointly owned real estate paid to petitioner. After the entry of this order the receiver proceeded to advertise the property and accept bids thereon.

By order entered on March 24, 1960, the District Court confirmed the sale of the real property owned by Fay Heasley and jointly by petitioner and Fay Heasley to Arvel Glinz and Marjorie Glinz for a total consideration of $225,300, payable $45,300 in cash upon confirmation of the sale, $100,000 of the balance payable in four equal annual installments, commencing March 1, 1961, and a final installment of $80,000 on March 1, 1965.

On April 8, 1960, the court entered an order approving the report of the receiver dated April 2, 1960, amending the order of March 24, 1960, confirming the sale, directing payment of one-half of the proceeds from the sale of the jointly owned real estate to Selma Heasley, the amount to be computed in accordance with the method suggested by the receiver.

On April 8, 1960, Fay Heasley and petitioner lost possession of the land involved in the receivership proceedings. The only land farmed by Fay Heasley and petitioner or by Fay Heasley during the years here involved other than the land involved in the receivership proceeding, was a quarter section of land which was leased by petitioner and Fay Heasley. During the years 1958 and 1959, the receiver took under his control all the income derived from the rented quarter section farmed by Fay Heasley and petitioner.

All moneys received by the receiver were deposited with the court and all disbursements were made by check on the depositary account. The receiver, after his appointment in 1958, took control of all grain which was produced in 1958 on the properties owned by Fay Heasley and by petitioner and Fay Heasley jointly and also of all grain produced from the quarter section which petitioner and Fay Heasley rented.

All this grain was subsequently disposed of by the receiver. The receiver entered into an agreement with Paul Heasley, Bob Hendrix, and Arley Herr that for the year 1959 they would farm the land owned solely or jointly by Fay Heasley which was held by the receiver with one-fourth of the crop produced to go to the receiver and three-fourths to be retained by the three men who were farming the land.

The only receipts from grain sales shown by the records in the depositary account are from the sale of the 1958 grain crop and one-

454

fourth of the 1959 grain crop. As to the sale of the 1958 grain crop, the record shows the following:

Jan. 25, 1960 RECEIVED FROM HENRY W. ANDERBERG, RECEIVER—10 checks which represent 1958 crop belonging to the RECEIVERSHIP ESTATE IN above matter—

Draft 7142—Windsor Farmers Co-Op. Elevator Ass'n—(7972.16 net bushels barley) _____ $5,740.07

Draft 7143—Windsor Farmers Co-Op. Elevator Ass'n—(8408.18 net bushels barley) _____ 6,054.03

Draft 55—Windsor Farmers Co-Op. Elevator Ass'n—(4824.46 net bushels barley) _____ 4,073.66

Draft 68—Windsor Farmers Co-Op. Elevator Ass'n—(6074.40 net bushels wheat) _____ 11,468.96

Draft 56—Windsor Farmers Co-Op. Elevator Ass'n—(11,592 net bushels wheat) _____ 21,885.67

Draft 69—Windsor Farmers Co-Op. Elevator Ass'n—(5637.50 net bushels wheat) _____ 10,678.88

Draft 70—Windsor Farmers Co-Op. Elevator Ass'n—(5084.00 net bushels wheat) _____ 9,598.59

Draft 7144—Windsor Farmers Co-Op. Elevator Ass'n—(2561.10 net bushels flax) _____ 8,118.94

Draft 7180—Windsor Farmers Co-Op. Elevator Ass'n—(3.32 net bushels flax) _____ 11.31

Draft 21871—Farmers Union Grain Terminal Ass'n, Sydney, N.D.—(963.24 net bushels barley) _____ 665.02

The records of the depositary account show, under date of November 30, 1959, the following receipts by the receiver from the one-fourth share of the 1959 grain crop:

Draft No. 48, Windsor Farmers Co-Operative Elevator Association (755.48 net bushels) _____ $604.25

Draft No. 7122, Windsor Farmers Co-Operative Association (36.24 net bushels) _____ 29.56

Draft No. 47, Windsor Farmers Co-Operative Elevator Association (239.16 net bushels) _____ 776.71

Draft No. 46, Windsor Farmers Co-Operative Elevator Association (1041.50 net bushels) _____ 1,974.83

Draft No. 49, Windsor Farmers Co-Operative Elevator Association (1725.00 net bushels) _____ 3,274.05

Draft No. 5488, Farmers Union Co-Operative Elevator Co. (1234.16 net bushels) Eldridge, N. Dak _____ 962.91

Draft No. 21856, Farmers Union Grain Elevator (Sydney, N.D.) (563.50 net bushels) _____ 1,061.31

Under date of December 10, 1959, the following receipt was recorded in the depositary account:

Rec'd thru Herman Weiss, Atty., Jamestown—Draft No. 50—Windsor Elevator, payable to Henry H. Anderberg Rec., and Endorsed by him, Henry W. Anderberg to the U.S. Dist. Clerk only,—being Receivership Estate's ¼ share of 1959 crop _____ $5,747.74

The records show no disbursements to petitioner in 1960. Under date of April 8, 1960, the following disbursements are shown to Arley Herr, Bob Hendrix, and Paul Heasley:

Ck. #2,034—Arley Heer [sic] and Helen Heer [sic]_____ $7,916.08
Ck. #2,035—Bob Hendrix and Pearl Hendrix_____ 12,556.27
Ck. #2,036—Paul Heasley_____ 14,603.49
Ck. #2,037—Paul Heasley, Arley Heer [sic] and Bob Hendrix_____ 81.96
Each of above—"Claim against Receivership Estate in U.S. vs. Fay Heasley, et al.,—Order of April 8, 1960"

These amounts represent primarily claims to a part of the proceeds from the sale of the 1958 grain crop. Under date of June 6, 1961, the records of the receivership show a disbursement to Selma Heasley of $933.89 in payment of her claim filed in the receivership proceeding to a share of the 1958 grain crop sold, and under this same date a disbursement of $13,833.42 is recorded in full payment of her joint tenancy interest in the real estate sold.

Respondent's notice of deficiency to petitioner for the year 1959 was mailed on April 12, 1963. In this notice respondent showed adjusted gross income reported as a loss of $5,538.08, which was the amount of loss shown on the return filed in the name of Fay and Selma Heasley. As additional income respondent showed an increase in net farm income of $30,111. Respondent allowed a net operating loss carryover of $4,441.76, nonbusiness deductions of $7,146.19, and a personal exemption of $600, thus determining taxable income as adjusted to be $12,384.97, on which he computed an income tax liability of $3,565.64, to which he added self-employment tax of $180 making a total tax liability of $3,745.64, less a liability of "none" shown on the return, resulting in a deficiency in income tax of $3,745.64.

Respondent's notice of deficiency for petitioner's taxable year 1960, which was dated January 31, 1964, shows that no return for 1960 was filed by petitioner. In this notice, the net farm income which is the income on which the deficiency was computed is shown to be comprised of:

Gross income from farming:
    Grain sales_____ $7,183.06
    Livestock sales_____ 4,167.26
    Gas tax refunds_____ 326.00
    Co-op dividends_____ 255.00

    Gross farm income_____ 11,931.32
  Less farm expenses_____ 5,818.68

 Net farm income_____ 6,112.64

From the net farm income of $6,112.24 respondent in his notice of deficiency subtracts a nonbusiness deduction for sales tax in the amount of $61.12 and a personal exemption of $600, thus determining a taxable

income as adjusted of $5,451.52. Respondent computed petitioner's income tax liability based on the income so determined to be $1,217.40 to which he added self-employment tax of $216, making a total tax liability of $1,433.40. Respondent's computation showed that since no valid return had been filed by petitioner for the taxable year 1960, the deficiency in petitioner's income tax for that year was $1,433.40.

Respondent's computation of petitioner's tax liability for each of the years 1959 and 1960 was on the basis of a married person filing a separate return.

OPINION

Although petitioner contends that the net operating loss carryover as allowed by respondent is understated and should be in the sum of $6,120 no evidence was offered at the trial of this case bearing in any way on the amount of the net operating loss carryover to which petitioner is entitled in the year 1959. We, therefore, sustain respondent in his determination of the amount of petitioner's net operating loss carryover to 1959 because of petitioner's failure of proof of error in that determination.

Petitioner's contention that the deficiency for the year 1959 is overstated in that she was not given an allowance for $2,387.51 is on the basis that she had paid this amount of income tax. The facts which we have set forth show that the only portion of the tax which was paid, as distinguished from credited to petitioner's account, was $435.74, and that this amount was paid by a check drawn on the depositary account of the receiver. However, the balance of the account (the assessment of tax of $2,387.51 and interest of $310.38) was discharged by the allowance by respondent of a credit for a loss carryback in the amount of $2,207.51 and an abatement of $60.42. As of the date the notice of deficiency was issued, the account of Fay and Selma Heasley showed that there had been an assessment of income tax of $2,387.51 which had been satisfied in full and had no outstanding balance.

It is true, as respondent points out, that on April 15, 1963, which was 3 days after the mailing by respondent of the notice of deficiency on April 12, 1963, the credit and abatement previously allowed were reversed. However, the situation as it exists at the date of the mailing of the notice of deficiency governs the question of the existence of a statutory deficiency. While petitioner's argument here is that the amount was paid, in our view the issue raised is sufficient to include the question of whether there was a deficiency of the amount previously assessed and discharged in part by a credit.

Section 6211 of the Internal Revenue Code of 1954 [2] defines deficiency to mean the amount by which the tax imposed exceeds the excess of the sum of the amount shown as tax by the taxpayer on his return plus amounts previously assessed (or collected without assessment) as a deficiency over the amounts of rebate as defined in subsection (b) (2).

We are not here concerned with any real question of rebates since this terminology could apply only to the $60.42 abatement and because of lack of evidence as to this item we will consider it to be a rebate.

The facts in the instant case show that no amount was shown by the taxpayer as tax on the return filed but that an assessment was made on June 15, 1962, in the amount of $2,387.51 against petitioner, the explanation being "Account No. ME 77." Respondent offered in evidence as an exhibit the certificate of assessments and payments. This exhibit was offered through a witness who was in charge of the records in the office of the district director of internal revenue from which the certificate was prepared. Respondent's counsel did not question this witness as to or offer any explanation of the meaning of the letters, "ME." There is no evidence to show whether or not any prior deficiency notice had been issued to petitioner or to petitioner and Fay Heasley jointly.

Section 6213(a) provides that no assessment of a deficiency in respect of any income tax shall be made until a notice of deficiency has been mailed to the taxpayers and section 6213(b) provides for an exception in the case of a mathematical error on the return. The latter section states that if the taxpayer is notified that, on account of a mathematical error appearing upon the return, an amount of tax in excess of that shown upon the return is due, and that an assessment of the tax has been or will be made on the basis of what would have been the correct amount of tax except for the mathematical error, such notice shall not be considered as a notice of deficiency. No petition to this Court may be filed from such a notice and assessment and collection of the amount determined by correction of the mathematical error may be made without awaiting the expiration of the time permitted for filing a petition with this Court when a notice of deficiency has been sent a taxpayer.

---

[2] SEC. 6211. DEFINITION OF A DEFICIENCY.

(a) IN GENERAL.—For purposes of this title in the case of income, estate, and gift taxes, imposed by subtitles A and B, the term "deficiency" means the amount by which the tax imposed by subtitles A or B exceeds the excess of—

(1) the sum of

(A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus

(B) the amounts previously assessed (or collected without assessment) as a deficiency, over—

(2) the amount of rebates, as defined in subsection (b)(2), made.

We must assume that the Commissioner acted under the authority of the statute in assessing an income tax against petitioner for the year 1959. This means that the assessment must have been in accordance with a notice of deficiency previously issued or a determination of a mathematical error. If the amount of $2,387.51 were assessed as a deficiency, then this same amount did not constitute a statutory deficiency when the notice from which the petition in this case was filed was issued under the definition of deficiency contained in section 6211 previously set forth. If the assessment was based on the correction of a mathematical error, from notice of which petitioner had no right to file a petition to this Court, the amount could be considered in effect to be an amount of tax shown by petitioner on her return, see *James R. Fleming*, 33 T.C. 336, 340 (1959), or as an amount assessed as a deficiency for which no notice was required. See *Hastings & Co.* v. *Smith*, 224 F. 2d 875, 879 (C.A. 3, 1955). Therefore, it would appear that at the time respondent issued the notice of deficiency the total tax liability for the year 1959 as determined by respondent did not constitute a deficiency. The amount of $2,387.51, had been shown by petitioner on her return or previously assessed as a deficiency and only $60.42 thereof was a rebate. Respondent's records show that this assessment to the extent of $2,327.09 has never been abated. The credit against this assessment of $2,207.51 was reversed and a balance due of $2,267.93 entered on respondent's records on April 15, 1963. Whether, having allowed a credit, it was incumbent upon respondent to make some statement in the deficiency notice reversing the credit, we need not decide, since the issue is not raised by either party. Respondent's certificate of assessment shows an unpaid assessed balance due by petitioner. We are not concerned with collection matters. Therefore in the recomputation under Rule 50 of the deficiency, if any, for the year 1959 in accordance with our holding herein, there should be subtracted from the computed total tax liability for 1959, the prior unabated assessment which is the amount of $2,327.09. If the question of overpayment arises, the only payment shown by the evidence to have been made by or on behalf of petitioner for 1959 is $435.74.

The next issue involves the question of whether petitioner in the year 1960 derived income from the sale of grain in the amount of $7,183.06. At the trial, even though invited to do so by the Court, respondent's counsel refused to state the source of his information that petitioner had income from the sale of grain in the amount determined by him, except to say, "From third-party records." All of the income figures used by respondent in computing petitioner's income for 1960 are in the exact amount of the figures used by the receiver in the schedule filed under the name, "Fay Heasley" in the 1960 return

filed by him under the name of Fay and Selma Heasley. We, therefore, conclude that it was from this source that respondent obtained his figures for petitioner's income.

Since all receipts from grain produced on land owned or rented by petitioner or Fay Heasley for 1958, 1959 and 1960 is accounted for in the record except receipts from grain produced on the rented one-quarter section in 1960, we conclude that the $7,183.06 constituted the receipts from the sale in the fall of 1960 of grain produced on the rented one-quarter section in the year 1960. The evidence shows that all the grain from the 1959 crop from all lands which were owned or rented by petitioner and Fay Heasley was taken over by the receiver. The inference is that this grain was sold in November and December 1959, since the receiver was paid for his one-fourth interest therein in late November and early December 1959. The evidence shows that the other three-quarters of the receipts from this grain went to Paul Heasley, Bob Hendrix, and Arley Herr. The record shows that the only grain produced from land owned or rented by Fay Heasley or by Fay Heasley and petitioner which was sold by the receiver in 1960 was the 1958 grain crop.

Although petitioner had filed a claim in the receivership proceedings for payment from the proceeds of the 1958 grain crop, she was paid nothing in 1960 from the receivership account but was paid $933.61 in 1961 for her interest in the 1958 grain crop.

There is no specific testimony in the record as to when the 1960 grain crop would be harvested. However, the inference is unmistakable that such date would be subsequent to April 8, 1960, on which date Fay Heasley and petitioner lost possession of the land owned by them jointly or by Fay Heasley. Therefore, petitioner and Fay Heasley would have no 1960 grain crop from this land. The receiver's records show no income in 1960 from sales of any grain except from the 1958 grain crop. The record therefore leaves unaccounted for the receipts from the sale of grain in 1960 produced on the rented quarter section except for the $7,183.06 which respondent has included in petitioner's income. Fay Heasley's testimony was generally that the receiver took all the grain produced, but we cannot infer that this applied to the 1960 crop on the rented quarter section since there is no showing of any amount deposited in the receivership account from the sale of such grain during any of the years covered by that account. There is no specific testimony with respect to such grain, but since it is shown as income of Fay Heasley on the return prepared by the receiver and respondent has used the identical amount shown on that return as grain sales by Fay Heasley in the notice of deficiency as income to petitioner, we believe the reasonable inference to be that the $7,183.06 was the proceeds from the sale of all the grain produced

on the quarter section rented by Fay Heasley and petitioner which was sold in 1960. Petitioner has made no specific showing of the amount of this income which is hers and the amount which is Fay Heasley's. The testimony is that Fay Heasley and petitioner operated the rented quarter section jointly. We, therefore conclude that one-half of the income from the grain receipts from grain produced on this land was income of petitioner and sustain respondent in his inclusion of income from grain receipts in petitioner's 1960 income to the extent of $3,591.53.

The record shows that on the return filed in 1960 by the receiver, Henry W. Anderberg, it is stated that petitioner and Fay Heasley both refused to sign the document. The record also shows that Anderberg was receiver for Fay Heasley only and therefore would have no authority to file a return for petitioner. We therefore sustain respondent in his determination that no return was filed by petitioner in 1960. Therefore petitioner is not entitled to have her income computed on the basis of having filed a joint return for the year 1960.

The year 1959 presents a more difficult question. Petitioner and Fay Heasley did file a Form 1040 in their joint names for the year 1959. All the schedules attached to the Form 1040 indicate that income and deductions of both Fay and Selma Heasley are reported thereon.

Respondent treated this return as a joint income tax return by setting up an account in the name of Fay and Selma Heasley, making an assessment of tax liability on the basis of a return in their joint names, allowing tentatively a carryback credit from a return apparently filed by the receiver for the year 1961 and crediting a payment made by a receiver's check to the assessment made on the basis of this return. The issuance and crediting of this check as well as the other evidence of record indicate that the receiver, and until April 1963 the respondent, considered the return filed by Fay and Selma Heasley for the year 1959 as a proper joint return with no other return of either being due to be filed for that year.

Respondent now argues that "Fay Heasley was legally unable to make a 1959 return required under section 6012(a) of the Code and the duly appointed receiver was bound to file such return for Mr. Heasley." Respondent concludes from this statement that since Fay Heasley was unable to make a 1959 return, the Federal income tax return which he and petitioner executed does not qualify as a joint return. Respondent apparently assumes that since a receiver had been duly appointed for all of the assets of Fay Heasley, it followed that Fay Heasley could not legally make his own return for 1959. Respondent's assumption appears to be predicated upon the following provision of section 1.6012–3(b) (5), Income Tax Regs.:

(5) *Individuals in receivership.* A receiver who stands in the place of an individual must make the return of income required in respect of such individual. A receiver of only part of the property of an individual need not file a return, and the individual must make his own return.

This regulation appears to apply to section 6012(b) of the Code which provides as follows:

(b) RETURNS MADE BY FIDUCIARIES AND RECEIVERS—

\*       \*       \*       \*       \*       \*       \*

(2) PERSONS UNDER A DISABILITY.—If an individual is unable to make a return required under subsection (a) or section 6015(a), the return of such individual shall be made by a duly authorized agent, his committee, guardian, fiduciary or other person charged with the care of the person or property of such individual. The preceding sentence shall not apply in the case of a receiver appointed by authority of law in possession of only a part of the property of an individual.

(3) RECEIVERS, TRUSTEES AND ASSIGNEES FOR CORPORATIONS.—In a case where a receiver, trustee in bankruptcy, or assignee, by order of a court of competent jurisdiction, by operation of law or otherwise, has possession of or holds title to all or substantially all the property or business of a corporation, whether or not such property or business is being operated, such receiver, trustee, or assignee shall make the return of income for such corporation in the same manner and form as corporations are required to make such returns.

(4) RETURNS OF ESTATES AND TRUSTS.—Returns of an estate or a trust shall be made by the fiduciary thereof.

The statute specifically provides in the case of a receiver of all the property of a corporation that the receiver shall make the corporate return. There is no such provision in the case of a receiver of all the property of an individual. Respondent's regulation must, therefore, be under section 6012(b)(2) with respect to a person under a disability. This section provides that if an individual is unable to make a return, the return shall be made by his agent, fiduciary, or other person charged with the care of the person or property of such individual. When a "receiver \* \* \* stands in the place of an individual" is not explained in respondent's regulations. Certainly, Fay Heasley was able to make a return for the year 1959. In fact, he did make a return which was originally accepted by respondent and was approved by the receiver who made a payment of tax with respect thereto.

Respondent points to nothing to justify the conclusion that because a receiver has been appointed for all the property of an individual, that individual is placed under a legal disability to make a return. The receiver, if he makes a return, makes it not as a fiduciary but makes it for the individual in whose "place" he stands. In the recent case of *Stoler* v. *United States*, 320 F. 2d 340 (Ct. Cl. 1963), it was held that the appointment of a receiver for a calendar-year taxpayer did not end the existence of 1 taxable year of that taxpayer and begin another. In so deciding the court stated:

While such events as the death of an individual taxpayer or the dissolution of a corporation may create a taxable period of less than one year, the courts have

held that the appointment of a receiver does not end one taxable year and begin another.

The case of *In re Lister*, 177 F. Supp. 379 (E.D. Va. 1959), likewise holds that two taxable entities are not created when a receiver of a taxpayer's property is appointed. In that case a receiver had been appointed for a partnership business and had caused to be filed for the years involved a U.S. Partnership Return of Income on Form 1065. The Court concluded that this was the correct method of reporting the income.

As we interpret respondent's regulation, it places an obligation on the receiver to see that an individual taxpayer, all of whose property he controls, files a return. The necessary result of this duty might require the receiver to make the return for the taxpayer. It does not follow from this conclusion that the statute or regulation prohibits a taxpayer under such circumstances from making his own return. We do not construe respondent's regulation as requiring that the receiver make the return if the taxpayer for whom he is receiver is both willing and able to make his own return. A receiver who stands in the place of the individual is responsible for making a return for that individual. The return is the return of the individual. Our attention has been directed to nothing which prohibits the individual from making his own return if he is both able and willing and does do so. Even under circumstances where the individual is unable to make his own return, respondent's ruling would permit a joint return to be filed. In Rev. Rul. 55–387, 1955–1 C.B. 131, respondent held that where a taxpayer disappeared and his wife was appointed legal guardian to act for her husband, this fact did not preclude the filing of a joint return by the taxpayer for herself and as guardian of her missing husband.

Following this ruling to its logical conclusion it would appear that even if respondent's regulation required the receiver for Fay Heasley to make Fay Heasley's return, that return could be a joint return of the receiver for Fay Heasley and petitioner. If it were the duty of the receiver to file the return, the acquiescence by the receiver in the return filed by Fay Heasley and petitioner jointly and the payment of a portion of the tax assessed on that return with a check of the receivership estate indicates the acceptance by the receiver of the return as filed by Fay Heasley on a joint basis with petitioner. We, therefore, conclude that Fay Heasley and petitioner did file a joint return for the year 1959 and respondent erred in not computing petitioner's income tax for the year 1959 on the basis of a joint return.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*