PAUL W. ADAMS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

PAUL W. ADAMS, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6976-74—6981-74.     Filed April 11, 1979.

---

*Sherin V. Reynolds*, for the petitioner.
*Thomas P. Dougherty, Jr.*, for the respondent.

SUPPLEMENTAL OPINION

FAY, *Judge:* On May 17, 1974, respondent mailed to petitioner, Paul W. Adams, six statutory notices of deficiency in which he determined various chapter 42 excise tax deficiencies under Code section 4941[1] against petitioner, individually and as transferee of Automatic Accounting Co. (Automatic), a corporation wholly owned by petitioner. The asserted deficiencies arose out of several alleged "acts of self-dealing" between a private foundation and petitioner and Automatic.

Subsequent to the filing of the petitions in these cases, a trial was held in Bridgeport, Conn., on October 18, 1977. Thereafter the parties submitted briefs, and on May 30, 1978, our findings of fact and an opinion were filed in which we, in part, sustained respondent's determination: (1) That several acts of self-dealing occurred between petitioner and Automatic and a private foundation; and (2) that petitioner was subject to the 5-percent excise tax under section 4941(a)(1) with respect to such acts. *Adams v. Commissioner*, 70 T.C. 373 (1978). As yet, final decisions have not been entered in these cases.

In his statutory notices, respondent further asserted a 200-percent excise tax under section 4941(b)(1) for the same acts of self-dealing. However, because of the wording of the statute under which the 200-percent tax is imposed, a serious question was raised as to the authority of this Court to enter a decision determining a section 4941(b)(1) tax liability. Thus, in our opinion of May 30, 1978, we did not decide petitioner's liability for the 200-percent excise tax under section 4941(b)(1) with respect to those acts of self-dealing for which petitioner was liable for the 5-percent excise tax under section 4941(a)(1). Instead, we requested that the parties submit briefs discussing our authority to determine a section 4941(b)(1) tax. *Adams v. Commissioner*, 70 T.C. 446 (1978). In accordance with this request, supplemental original and reply briefs were received

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

from the parties. Following from all this, our opinion herein deals primarily[2] with the question of petitioner's liability for tax under section 4941(b)(1) for those acts of self-dealing set forth in our opinion dated May 30, 1978.[3]

Generally speaking, section 501(a) exempts from Federal income taxation certain organizations, including private foundations as defined by section 509, which are operated for charitable purposes and "no part of the net earnings of which inures to the benefit of any private shareholder or individual." Prior to 1970, compliance with this latter prohibition was insured, at least in part, by section 503 which imposed arm's-length standards of conduct on dealings between a private foundation and its founders and major contributors. Penalties for violation of these standards included the loss of the foundation's exempt status for a minimum of 1 year, and the disallowance of deductions to donors for contributions during such period. *Adams v. Commissioner*, 70 T.C. 373, 379 (1978).

The subjective element present in the arm's-length standard created many problems in enforcement. These problems led to its eventual elimination in 1969 and replacement with a general prohibition on any transactions between a private foundation and a "disqualified person." S. Rept. 91–552 (1969), 1969–3 C.B. 423, 442–443.[4] The penalties for noncompliance with this general prohibition include, inter alia, a graduated series of excise taxes found in section 4941.[5] Thus, a transaction between a private foundation and a "disqualified person,"[6] even though entered into and conducted in accordance with arm's-length standards, is considered an "act of self-dealing" and subject to the imposition of excise taxes under section 4941. Further, under the 1969 legislation, the penalties added by section 4941 were shifted from the foundation to the disqualified person.

---

[2]A second question addressed *infra* concerns the application of the transitional rule set forth in sec. 53.4941(f)–1(b)(2), Foundation Excise Tax Regs.

[3]Our findings supporting our conclusion that petitioner engaged in acts of self-dealing, and is therefore subject to a 5-percent excise tax under sec. 4941(a)(1), are set forth in *Adams v. Commissioner*, 70 T.C. 373 (1978). Because a complete familiarity with those findings is not necessary to an understanding of the issue herein, for simplicity's sake, we have omitted any detailed reference to them.

[4]Unless otherwise indicated, all references to committee reports are to the pages in the Cumulative Bulletin where such reports are reprinted.

[5]See also sec. 6684 which contains a penalty in the case of repeated acts or a willful and flagrant act of self-dealing.

[6]The term "disqualified person" is defined in sec. 4946 to include, among others, substantial contributors to the foundation, as well as officers, directors, and trustees of the foundation.

Simply stated, there are two levels of sanctions contained in section 4941. Section 4941(a)(1) levies against the self-dealer a first-level excise tax equal to 5 percent of the "amount involved" with respect to each act of self-dealing. This first-level tax is imposed for each year, or part thereof, beginning on the date of the self-dealing and continuing until the earlier of the date the self-dealing is corrected, or the Government sends a deficiency notice regarding the transaction. Following the imposition of the first-level tax, the self-dealer is given the opportunity to correct the act of self-dealing within the "correction period."[7] "Correction" usually entails undoing the transaction to the extent possible. Sec. 4941(e)(3). If correction of the act is not timely made, subsection (b)(1) imposes upon the self-dealer a second-level tax equal to 200 percent of the "amount involved." It is the timing of the imposition of this second-level tax which presents us with our primary problem herein.

As previously mentioned, in his statutory notices, respondent has determined deficiencies against petitioner in the section 4941(b)(1) second-level tax with respect to those acts of self-dealing for which we, in our opinion dated May 30, 1978, held petitioner liable for the section 4941(a)(1) first-level tax. In seeking a redetermination of these asserted second-level tax liabilities, petitioner, in essence, is contending that there is no "deficiency" in the second-level tax as that term is defined in section 6211(a). For the reasons set forth below, we agree with petitioner.

We begin by noting that section 7442 limits the jurisdiction of this Court to that conferred upon it by statute. *Adams v. Commissioner*, 70 T.C. 446, 447 (1978). With a few exceptions pertaining to declaratory judgments[8] and refunds of certain overpayments,[9] our statutory jurisdiction consists of authority to redetermine the correct amount of a "deficiency" as determined by the Commissioner. Sec. 6214(a). The term "deficiency," as it relates to the present case, is defined in section 6211(a) to mean "the amount by which the tax *imposed* by * * * chapter 42" exceeds that shown on the return. (Emphasis added.) The time at which the determination of the existence of the deficiency is made is the date of the mailing of the statutory notice by the

---

[7]The meaning of the term "correction period" is discussed *infra*.
[8]See secs. 7428, 7476, 7477, and 7478.
[9]See sec. 6512(b).

Commissioner. *Heasley v. Commissioner*, 45 T.C. 448, 456 (1966). Thus, if the Commissioner asserts a deficiency in tax and, because of the particular facts of a case or the applicable law, the tax asserted has not been imposed as of the date of the statutory notice, there is no "deficiency" as defined in section 6211(a). Put simply, in the absence of a "deficiency" the taxpayer must prevail. We must therefore decide whether on the date of the mailing of the statutory notices of deficiency in this case there existed a deficiency in tax under section 4941(b)(1) as determined by respondent.

Section 4941(b)(1) provides that where a first-level tax under subsection (a)(1) is imposed on an act of self-dealing, and such act is not corrected within the "correction period," there is then imposed an additional tax.[10] The term "correction period" is defined in section 4941(e)(4) to mean:

the period beginning with the date on which the act of self-dealing occurs and ending 90 days after the date of mailing of a notice of deficiency with respect to the tax imposed by subsection (b)(1) under section 6212, extended by—

(A) any period in which a deficiency cannot be assessed under section 6213(a), * * *

Pursuant to section 6213(a), if a petition has been filed with this Court, assessment of a deficiency cannot be made until the decision of this Court becomes final. See secs. 7481 and 7483.

Under this statutory scheme, the second-level tax is not imposed, assuming no correction occurs, until the expiration of the correction period. However, the correction period does not expire until the decision of this Court with respect to the second-level tax becomes final.

The effect of all this may be summarized as follows: On the date of the mailing of the notice of deficiency which determines the second-level tax, our decision with respect to that tax obviously has not yet become final. Since our decision is not final, under section 4941(e)(4) the correction period has not expired. Pursuant to section 4941(b)(1), the expiration of the correction period is a prerequisite to the imposition of the

---

[10]Sec. 4941(b)(1) provides as follows:

(b) ADDITIONAL TAXES.—

(1) ON SELF-DEALER.—In any case in which an initial tax is imposed by subsection (a)(1) on an act of self-dealing by a disqualified person with a private foundation and the act is not corrected within the correction period, there is hereby imposed a tax equal to 200 percent of the amount involved. * * *

second-level tax. If the tax is not imposed until the correction period expires, it is clearly not imposed on the date of the mailing of the statutory notice and, therefore, there is no "deficiency" as that term is defined in section 6211(a). Because petitioner has sought this Court's redetermination of a deficiency determined by respondent, and because no deficiency exists, we are bound to enter a decision for petitioner as to the second-level tax.

Respondent admits the logical inconsistency in a literal reading of the statute, i.e., that the second-level tax cannot be "imposed" until the expiration of the correction period which, in turn, is defined as occurring at the same time our decision with respect to such tax becomes final. However, to give effect to the "clear Congressional intent" as expressed in the legislative history, he asserts that the inconsistency should be resolved by interpreting the statute such that the second-level tax is imposed when the act of self-dealing occurs. Thus, respondent maintains, if this Court finds that an act of self-dealing occurred, we would enter a decision sustaining respondent's determination that petitioner is liable for the first- and second-level taxes. Thereafter, if petitioner corrects the act before our decision becomes final, the second-level tax would be abated. In the event that petitioner fails to timely correct, the second-level tax would then become irrevocably imposed. In support of his position, respondent argues that a literal interpretation of the statute would produce an absurd result and emasculate the deterrent effect of the self-dealing provisions.

We agree with respondent that Congress intended, through the imposition of the first- and second-level taxes, to eliminate self-dealing transactions. S. Rept. 91–522 (1969), 1969–3 C.B. 423, 442. We also agree with respondent that a statute should not be literally read so as to frustrate congressional intent. Unfortunately, however, while the ultimate goal of Congress may be clear, the method by which it sought to achieve its objective is anything but clear. In his brief, respondent has suggested certain procedural steps to handle the unusual problems presented by cases of this type. After carefully considering his suggestions and other alternatives, we have concluded that for us to piece together a procedure to reach the results intended by Congress in this and subsequent cases would necessitate rewriting many portions of the statute. This we decline to do.

First of all, the statutory provisions relating to the timing of the imposition of the second-level tax are not ambiguous on their face. Subsection (b)(1) of section 4941 very clearly provides that a precondition to the *imposition* of the second-level tax is the failure to correct an act of self-dealing within the correction period. Subsection (e)(4) unequivocally extends the correction period until our decision becomes final. The statute most certainly does not, as respondent asserts, impose the tax on the date of the act of self-dealing. Moreover, the legislative history tends to refute respondent's contention. Indeed, the committee reports accompanying the statute, if anything, lend further support to our construction of these provisions. In this regard, the committee reports provide:

*The second-level sanction, imposed only after notice of deficiency and adequate opportunity for court review and undoing the self-dealing transaction,* is intended to be sufficiently heavy to compel voluntary compliance (at least, after court review). The committee expects application of this sanction to be rare, but where the parties refuse to undo the transaction, it is expected that this sanction will be applied. [S. Rept. 91–522 (1969), 1969–3 C.B. 423, 445; emphasis added.]

Therefore, taking into account the time at which the second-level tax is imposed, together with the fact that nothing exists to indicate that the word "imposed" in section 4941(b)(1) has a meaning different than the word "imposed" used to define the word "deficiency" in section 6211(a), the conclusion that no deficiency exists is inescapable.

A second statutory obstacle to the results desired concerns the procedure for determining the amount of the second-level tax. Pursuant to section 4941(b)(1), the second-level tax is imposed at a rate equal to 200 percent of the "amount involved." Section 4941(e)(2) defines the "amount involved" as the "greater of the amount of money and the fair market value of the other property given or * * * received" in the self-dealing transaction. This subsection also provides that, in the case of a second-level tax, the "fair market value" of the property involved shall be its highest fair market value during the correction period. Because expiration of the correction period is dependent upon a final decision of this Court, and because the appeal process may forestall the finality of our decision for years, the value of the property involved may fluctuate substantially during the correction period. Thus, the amount of the second-level tax is incapable

of determination until our decision becomes final. However, once that decision becomes final, by whom and through what procedure is the determination made of the highest fair market value of the property involved during the correction period? If the parties are unable to reach agreement on a value, is a trial held to decide the issue? If so, in which forum is the trial conducted?

To circumvent these problems, respondent submits that prior to the entry of our decision with respect to the first- and second-level taxes, the "amount involved" could be stipulated by the parties at a hearing under Rule 155, Tax Court Rules of Practice and Procedure. In the unlikely event that the parties cannot agree upon an amount, a trial would be held to determine the highest fair market value of the property up to that time. Once the value of the property is so determined, a decision would be entered regarding the amount of the second-level tax. Respondent admits that this procedure would constitute a finding of the highest fair market value of the property up to the date of the entry of the decision rather than the date the correction period ended. Thus, there exists the possibility that the self-dealer might escape an increased tax liability resulting from an increase in the fair market value of the property involved between the entry of the decision and the finality of that decision; however, respondent is apparently willing to concede this "windfall" to the self-dealer.

While we are sympathetic with respondent's plight, we simply cannot accept his proposed solution. As with the timing of the imposition of the second-level tax, Congress has made clear, through the plain words of the statute and in the legislative history, its intent regarding the amount of the second-level tax. In pertinent part, the committee reports state:

For purposes of [the second-level tax], the amount involved is the highest fair market value of the property during the period within which the transaction may be undone. This provision is intended to impose all market fluctuation risks upon the self-dealer who refuses to comply and to give the foundation the benefit of the best bargain it could have made at any time during the period. [S. Rept. 91–552 (1969), 1969–3 C.B. 423, 445.]

Admittedly, the statutory formula for computing the amount of the second-level tax is impracticable; however, that fact does not negate the otherwise clear intent of Congress regarding the amount of the tax. Acceptance of respondent's approach in this

and all other cases would constitute nothing more than substituting his intent for that of Congress. This we cannot do.[11]

A third serious problem with the wording of the statute involves the question of "correction" of an act of self-dealing. Section 4941(e)(3) generally defines "correction" to mean "undoing the transaction to the extent possible." If we accept respondent's postulations with regard to the timing of the imposition and determination of the amount of the second-level tax, what procedure is used for abatement of this tax in the event correction occurs?

Similar to his suggested solution regarding the determination of the amount of the second-level tax, respondent submits that prior to the entry of a decision with respect to the first- and second-level taxes, the steps necessary to correct could be stipulated by the parties at a hearing under Rule 155, Tax Court Rules of Practice and Procedure. If the parties are unable to agree, this Court could then determine what steps would constitute correction. If the self-dealing is thus corrected prior to the finality of our decision, the assessment of the second-level tax would be abated by the respondent. See sec. 6404(a). Again, we must reject respondent's simplistic approach to the problem.

Accepting respondent's proposed procedure for the moment,[12] assume that petitioner, or any other taxpayer, appeals a decision of ours that is adverse to him. Further assume our decision is subsequently affirmed by the Court of Appeals, and thereafter petitioner makes a bona fide effort to correct before our decision becomes final. At this juncture, who makes the determination of whether correction of the act occurred thereby abating the second-level tax? What if respondent and petitioner disagree as to whether the steps decided upon in our Rule 155 hearing have been followed? If the parties so disagree and respondent assesses and collects the second-level tax, must petitioner thereafter sue

---

[11]This taxpayer "windfall" that respondent is ready to concede will in many cases be more than offset by a "windfall" in respondent's favor if we adopt his position that the second-level tax is imposed at the time of the act of self-dealing. This windfall will be in the form of interest which, if respondent's theory is pursued across the board, will run from the date of the act of self-dealing rather than from the date that this Court's decision becomes final. Sec. 6601(b)(4). If interest were to run from the earlier date, the magnitude of the penalty could be greatly increased, contrary to the imposition provision of the statute as it is presently written.

[12]But see 28 U.S.C. sec. 2201, which, inter alia, precludes the issuance of declaratory judgments with respect to Federal taxes.

for a refund in the district court or is he precluded from doing so under section 7422(g)(2) which provides:

(2) LIMITATION ON SUIT FOR REFUND.—No suit may be maintained under this section for the credit or refund of any tax imposed under section 4941, * * * with respect to any act (or failure to act) giving rise to liability for tax under such sections, unless no other suit has been maintained for credit or refund of, and no petition has been filed in the Tax Court with respect to a deficiency in, any other tax imposed by such sections with respect to such act (or failure to act).

In discussing this provision, the committee reports state:

Refund suits for first- or second-level taxes may be brought in the Court of Claims or in a district court *(but only if there has been no prior court review of the prohibited act)*. Also, any refund suit will be treated as disposing of all issues relating to any first- or second-level tax arising out of that prohibited act. *An opportunity is provided for one court review of a self-dealing transaction, but no more than one review.* [S. Rept. 91–552 (1969), 1969–3 C.B. 423, 446; emphasis added. See also sec. 7422(g)(3).]

Although not conclusive, from this it would appear that petitioner would not have the opportunity of having his correction reviewed in the district court, and it is also unclear whether this Court would be able to exercise jurisdiction over the matter. As a consequence, petitioner would be unable to seek a redress of any unwarranted assessment of the second-level tax by respondent. We think it unlikely that Congress intended such a result.

Another significant problem concerns the adequacy of the opportunity for judicial review of an act of self-dealing prior to correction. As respondent correctly observes, it is clear from the legislative history that Congress intended that court review of an act of self-dealing be available before requiring the taxpayer to correct. Respondent further notes that it would be harsh indeed to require correction of an act that may later be judicially determined not to be an act of self-dealing. Finally, respondent makes the statement, with which we agree, that Congress intended that once an act was reviewed and determined to be an "act of self-dealing," a taxpayer should be afforded sufficient time within which to correct.

With this congressional intent in mind, assume as respondent contends that the first- and second-level taxes are imposed when the act of self-dealing occurs. Further assume that this Court enters a decision which finds that an act of self-dealing occurred, and that both levels of taxes are due with the second level of tax,

however determined, subject to abatement if correction is timely made. Assume further that the Court of Appeals affirms our decision and that petitioner thereafter applies for certiorari to the Supreme Court. Because he has appealed our decision to the Supreme Court, our decision is not yet final under section 7481. Petitioner is now faced with the following dilemma: If he corrects the self-dealing before the Supreme Court acts upon his petition, he may have to undergo great expense needlessly in the event the Supreme Court subsequently accepts certiorari and reverses our decision. On the other hand, if he fails to correct in anticipation of a reversal of our decision, and if the Supreme Court subsequently denies certiorari, under section 7481, on the date of such denial, the Tax Court decision becomes final and petitioner no longer has an opportunity to correct. The effect of this would be to deny petitioner the opportunity to have an act of self-dealing fully reviewed before correction must occur. Again, we think it clear, and respondent apparently agrees, Congress did not intend such a result.[13]

Thus, we are confronted, on the one hand, with a legislative history which makes clear Congress' desire to curtail transactions between disqualified persons and private foundations and, on the other hand, with a statute which on its face is replete with infirmities which act to thwart that intent. After careful consideration of the matter, we are constrained to apply the statute as written. We, therefore, hold that no deficiencies in tax under section 4941(b)(1) exist as determined by respondent. In so doing, we are not unmindful that the effect of our decision, for all intents and purposes, renders nugatory the second-level tax— at least as to those taxpayers who file a petition in this Court.[14] Moreover, we are cognizant of the fact that Congress has chosen this same scheme of taxation in several other Code sections.[15] Nevertheless, in our opinion, when considered in light of its intended objective, the statute at present is unworkable, and any

---

[13]A taxpayer would be faced with the same dilemma if this Court rejected respondent's determinations, the Court of Appeals reversed our decision, and the taxpayer applied for certiorari.

[14]Sec. 6213(a) restricts the assessment of a deficiency in the second-level tax prior to the sending of a statutory notice. Sec. 6212(c) precludes the issuance of a second statutory notice for the same act of self-dealing. See H. Rept. 91-413 (Part 2) (1969), 1969-3 C.B. 340, 351. Hence, while our decision that no deficiencies in the second-level tax *presently* exist does not prevent the imposition of such tax at a later date, secs. 6212(c) and 6213(a) nullify the effect of any subsequent imposition. Stated otherwise, if petitioner fails to correct the acts of self-dealing, respondent is nevertheless barred from ever asserting and collecting the second-level tax.

[15]See secs. 4942, 4943, 4944, 4945, 4947, 4951, 4952, 4971, and 4975.

corrective modifications thereto lie within the province of Congress.[16]

Finally, in our initial opinion, we held that petitioner was subject to the section 4941(a)(1) first-level tax upon the sale of certain real property (referred to in our initial opinion as "property #2") to a private foundation by petitioner's wholly owned corporation. We further held that the transaction fell within the ambit of the transitional rule in section 53.4941(f)–1(b)(2), Foundation Excise Tax Regs., which provides as follows:

(2) *Special transitional rule.*—In the case of an act of self-dealing engaged in prior to July 5, 1971, section 4941(a)(1) shall not apply if—

(i) The participation (as defined in section 53.4941(a)–1(a)(3)) by the disqualified person in such act is not willful and is due to reasonable cause (as defined in section 53.4941(a)–1(b)(4) and (5)),

(ii) The transaction would not be a prohibited transaction if section 503(b) applied, and

(iii) The act is corrected (within the meaning of section 53.4941(e)–1(c)) within a period ending July 16, 1973, extended (prior to the expiration of the original period) by any period which the Commissioner determines is reasonable and necessary (within the meaning of section 53.4941(e)–1(d)) to bring about correction of the act of self-dealing.

In reaching our conclusion, we interpreted language in respondent's opening brief to the effect that the "correction period," as defined in (iii) above, had not yet expired. (See 70 T.C. at 385 n. 23.) In his supplemental brief, respondent argues that in his opening brief, albeit "not fully articulated," his position was that the transitional rule did not apply to the sale of property #2 because the time for correction had expired. In essence, respondent maintains that we misinterpreted his position in his opening brief. Upon reconsideration and further review of the matter, we agree with respondent. We, therefore, hold that with respect to the act of self-dealing involving the sale of property #2, the transitional rule set forth above does not apply. Accordingly, petitioner is liable for the section 4941(a)(1) tax on such act.

In view of the foregoing, our original opinion is hereby

---

[16]It was not without considerable deliberation and thought that our decision herein was reached. We can certainly appreciate Congress' desire to eliminate the potential for abuse inherent in dealings with tax-exempt organizations. Also, we are not unaware of the difficulty in drafting legislation which will equitably dispose of a variety of factual settings. Regrettably, however, when considering all the potentially viable alternatives available to assist us in implementing the statute, we were consistently confronted with another statute or well-established rule of law which prevented our reaching a satisfactory resolution of the problems discussed herein.

modified and supplemented in accordance with our conclusions herein.

*Decisions will be entered for the petitioner in docket Nos. 6976–74, 6979–74, and 6981–74.*

*Decisions will be entered under Rule 155 in docket Nos. 6977–74, 6978–74, and 6980–74.*

Reviewed by the Court.

GOFFE, *J.*, concurring: In view of the impact of our decision, I feel compelled to comment briefly upon what I believe to be the primary problem in applying the statute as written.

The principal means by which Congress has chosen to eliminate transactions between private foundations and disqualified persons is through the imposition of the second-level tax. In this connection, the clear intent of Congress reflected in the language of section 4941(b)(1) and in the accompanying legislative history, is to condition a self-dealer's liability for the second-level tax upon his failure to undertake corrective action within the correction period. Thus, the self-dealer is not to be charged with the second-level tax provided he takes the steps necessary to undo the transaction prior to the time our decision with respect to the second-level tax becomes final. Therefore, since the underpinning of the statutory scheme is the second-level tax and because that tax is predicated upon a failure to timely correct, it is essential to determine whether any actions taken by a taxpayer to undo an act of self-dealing constitute correction within the meaning of the statute. In this regard, the statute unaccountably makes no provision for judicial review of the adequacy of corrective actions. To me, the need for review of corrective acts is necessary to insure that the statute is applied in a manner consistent with congressional intent and also to serve as a necessary protection for taxpayers. Unfortunately, however, there does not appear to be any legally sound and practicable solution to the problem within the present framework of the statute.

To illustrate this point, assume that T, a disqualified person, engages in an act of self-dealing with a private foundation and

is thereby subject to the first-level and second-level taxes under section· 4941. Assume further that this Court enters a decision sustaining the Commissioner's determination with respect to both levels of tax and that our decision is subsequently appealed and affirmed. Thereafter, and prior to the time our decision becomes final, assume that T makes a bona fide effort to correct the act. Because there is no provision for judicial review at this point, if the Commissioner disagrees as to whether T properly corrected, there is nothing to prevent him from assessing and collecting the tax at the moment the decision becomes final.[1] In such a case, there are no safeguards or procedures to protect a taxpayer who attempts to undertake correction. The taxpayer is, in short, at the mercy of the Commissioner and this, to me, demonstrates the most serious shortcoming of the statute.

Neither Judge Tannenwald nor Judge Simpson in his dissenting opinion offers any satisfactory solution to this enigma, nor could they do so without redefining the term "correction period." Specifically, Judge Simpson would reserve any judgment as to what will happen when the taxpayer undertakes to correct. However, our failing to recognize at this time that no procedure exists for judicial review of correction will serve only to compound the problem at a later date. Judge Tannenwald's approach, a severance of the issue of liability of the first-level and second-level taxes, likewise will not resolve the dilemma. By statute, the correction period does not expire until our decision with respect to the second-level tax becomes final. Thus, regardless of when a decision as to the second-level tax is entered, a taxpayer has the opportunity to correct at any time prior to the decision's becoming final, and so the problems created by the lack of judicial review of correction still exist.

Finally, I have serious doubts as to whether we could sever the issue of liability for the first-level and second-level taxes as Judge Tannenwald proposes. One of the requisites for the imposition of the second-level tax is liability for the first-level tax. Similarly, in the case of certain additions to tax, e.g., section 6653, a precondition to their imposition is the existence of a deficiency. In redetermining a deficiency and an addition to tax, we do not sever the two issues and enter a decision as to the

---

[1]Given the uncertainty of what acts constitute correction, disputes between the Commissioner and a taxpayer are inevitable.

deficiency and thereafter await its outcome on appeal before deciding the issue of the addition to tax. I disagree with Judge Tannenwald wherein he concludes that the second-level tax could be severed and a decision on the first-level tax would be appealable. I see no legal justification for treating the first-level and second-level taxes differently. In the first place, the legislative history makes it clear that the proposed assessments of the first-level and second-level taxes are to be set forth in a single statutory notice of deficiency.[2] H. Rept. 91–413 (Part 2) (1969), 1969–3 C.B. 340, 351. Second, the legislative history also expresses the desire of Congress to avoid multiple proceedings in determining liability with respect to both levels of taxes. S. Rept. 91–552 (1969), 1969–3 C.B. 442, 446. Judge Tannenwald's approach runs counter to this explicit intent. Moreover, I have serious doubt whether a decision on the first-level tax would be appealable. The general rule is that the only decisions of the Tax Court which are appealable are those in which a case is dismissed for lack of jurisdiction or those in which a dollar amount of a deficiency, overpayment or a deficiency of zero, or an overpayment of zero is entered. *Michael v. Commissioner*, 56 F.2d 825 (2d Cir. 1932). "That is to say, the word 'decisions' of the Tax Court has a meaning of art; it refers only to two kinds of judicial action by the Tax Court, *viz*, (1) 'dismissing the proceeding' pending before it, whether for lack of jurisdiction or otherwise, or (2) formally determining a deficiency, or the lack of a deficiency." *Commissioner v. Smith Paper, Inc.*, 222 F.2d 126, 129 (1st Cir. 1955). The only case in which an order was held not to be interlocutory but, instead, appealable is *Louisville Builders Supply Co. v. Commissioner*, 294 F.2d 333 (6th Cir. 1961). In that case, the Court of Appeals reversed an order of the Tax Court granting the Government's motion to take the deposition to perpetuate testimony where the taxpayer had not filed a petition in the Tax Court. Even in that case, the Court of Appeals hastened to point out, at page 339, "The Tax Court decision in the case at bar granted all the relief sought and disposed of the entire proceeding pending before it. The order entered was not interlocutory, and we consider it a decision of

---

[2]This point differentiates Judge Tannenwald's suggestion that the containment of the first-level and second-level taxes in a single notice is similar to a deficiency notice covering more than 1 taxable year. Unlike the situation of the first-level and second-level taxes, in the case of more than 1 taxable year it is perfectly proper to have a deficiency notice for each year.

the Tax Court subject to our review." Applying Judge Tannen-
wald's procedure would not dispose of all the relief sought
because the taxpayer seeks a holding that he is not subject to the
second-level tax.

While I share the views expressed in the dissenting opinions
that the courts should not lightly interpret a statute so as to
invalidate it, I think this obligation must be weighed with the
need to apply the statute which was enacted by Congress. Our
function is to interpret legislation, not rewrite it.

In order to implement the rationales of Judges Tannenwald
and Simpson, we would be involved in rule making. But our rule-
making function is limited.

The function of [court] rules is to regulate the practice of the court and to
facilitate the transaction of its business. This function embraces, among other
things, the regulation of the forms, operation and effect of process; and the
prescribing of forms, modes and times for proceedings. Most rules are merely a
formulation of the previous practice of the court. Occasionally, a rule is
employed to express, in convenient form, as applicable to certain classes of
cases, a principle of substantive law which has been established by statute or
decisions. *But no rule of court can enlarge or restrict jurisdiction. Nor can a
rule abrogate or modify the substantive law.* * * * [*Washington-Southern Co. v.
Baltimore Co.*, 263 U.S. 629, 635 (1924); emphasis added.]

*Clymer v. United States*, 38 F.2d 581 (10th Cir. 1930); *Concord
Casualty & Surety Co. v. United States*, 69 F.2d 78 (2d Cir. 1934);
*In the Matter of C.A.P.*, 356 A.2d 335 (D.C. Cir. 1976).

The [court] rule which has been adverted to by counsel was framed to
simplify and expedite practice and procedure. However expressed or however
understood, it can not enlarge the scope of the statute, nor modify the
conditions which are imposed upon the jurisdiction of the court. * * * [*The
Brig Hiram*, 23 Ct. Cl. 431, 440 (1888).]

This court may make rules to govern its own proceedings to the extent
provided by law but it has no power to enforce a rule which changes the effect
of a Federal statute. [*Graf v. United States*, 87 Ct. Cl. 495, 496 (1938).]

It is axiomatic that the rule-making power must conform with constitution-
al and statutory limitations. Consequently, rules of court, unless their validity
is to be questioned, must, of necessity, be reconciled with pertinent statutes.
* * * [*Berkey Technical Corp. v. United States*, 380 F. Supp. 786, 789 (Cust. Ct.
1973).]

There is no peculiar efficacy in a rule of court where none is authorized by
statute; a rule does not make law or restrict law; it is nothing more than the
order or direction of a court reduced to a convenient written form. It regulates
practice; it does not confer rights. * * * [*William W. Gilbert v. United States*,
35 Ct. Cl. 573, 575–576 (1900).]

I conclude from the foregoing authorities that we could not accomplish the goals recommended by Judges Tannenwald and Simpson in their dissenting opinions, which leaves no other course open but to concur with the majority.

Fᴀʏ and Wɪʟᴇꜱ, *JJ.*, agree with this concurring opinion.

Tᴀɴɴᴇɴᴡᴀʟᴅ, *J.*, dissenting: I agree with Judge Simpson that we should construe the statutory provisions in question in a manner that carries out congressional intent, but I think there is a better method than that outlined in his dissent for dealing with the disposition of the issue of the second-level tax.

The difficulty arises, as the majority points out, from the fact that the literal language of the statute provides for the imposition of a second-level tax if the act of self-dealing is not corrected, but the period during which the correction must be made does not end until our decision as to such tax becomes final, and the amount of such tax is determined with reference to the highest fair market value of the property involved during the correction period. Sec. 4941(b) and (e)(2) and (3). Judge Simpson would deal with this problem by entering a decision imposing the second-level tax, unless correction is made before the decision becomes final, in an amount based on the highest fair market value of the property preceding the date of decision. He would leave open the possibility that respondent could claim an increase in the amount of the second-level tax if the fair market value of the property involved increases after the entry of decision herein as to that tax but before that decision becomes final.

The problem of dealing with such an increase becomes acute if the fair market value of the property increases by over 100 percent during such period. Under these circumstances, it would be more advantageous for the self-dealer to accept and pay the second-level tax than to correct the act of self-dealing. Considering the inflation that currently prevails in our economy and the period of time that might elapse if the parties appeal to the Court of Appeals and perhaps also to the Supreme Court for certiorari, a possibility is presented that the intent of Congress that the foundation be given the benefit of any bargain it could

have made (S. Rept. 91–552 (1969), 1969–3 C.B. 423, 442, 445), will not be fulfilled.

Under Judge Simpson's approach, the responsibility for taking necessary action to carry out the intent of Congress in order to avoid this eventuality would be on respondent rather than on this Court. Obviously, in the situation described above, where the amount involved increases by over 100 percent, it is the foundation that has a real interest in seeing that correction is made. However, the foundation is not a party to the case and would seem to have no procedure available to it for seeking an increase in the penalty.

To minimize these problems and at the same time to adhere as closely as possible to the literal language of the statute, I would sever the issue of liability as to the second-level tax and enter a decision as to the first-level tax only, thereby delaying the determination of the amount of the second-level tax until the decision as to the first-level tax becomes final. Although the question of whether such a decision would be a final decision for purposes of appeal is not for this Court to decide, I believe it appropriate to note my view of the question. In my opinion, the question can and should be resolved in favor of appealability.

Section 7482(a) grants to the United States Courts of Appeals exclusive jurisdiction to review "decisions" of the Tax Court. Insofar as this case is concerned, a decision of this Court means either a dismissal of the case or a determination of a deficiency. Sec. 7459; *Commissioner v. Smith Paper*, 222 F.2d 126 (1st Cir. 1955). Thus, where an issue as to a rule of law is severed but does not result in determination of a deficiency, the Court's ruling on that issue is not appealable. *Michael v. Commissioner*, 56 F.2d 825 (2d Cir. 1932). On the other hand, the First Circuit has indicated that a decision as to 1 year in a case raising issues in more than 1 year might be appealable. *Commissioner v. Smith Paper, supra.* Cf. *Wilson v. Commissioner*, 42 B.T.A. 1254 (1940). The controversy involving two taxes in the instant case[1] is sufficiently similar to the suggestion dealing with severability for purposes of appellate jurisdiction, in cases involving a deficiency notice covering more than 1 year, to justify severance of the issue herein as to the second-level tax, particularly when

---

[1] That the two taxes may be related does not preclude a holding that a decision as to the first-level tax is a final decision for purposes of determining appealability. Cf. *Hudson Distributors v. Eli Lilly*, 377 U.S. 386, 389 n. 4 (1964).

doing so offers the potential for better implementation of legislative intention.

In *Gillespie v. United States Steel Corp.*, 379 U.S. 148 (1964), petitioner, as administratrix of the estate of her son, brought an action in a Federal court against the shipowner-employer of the son for damages on account of his death. She claimed a right to recover for the benefit of herself and the decedent's brother and sisters under the Jones Act, an Ohio wrongful death statute, and general maritime law. The District Court ruled that the Jones Act was the exclusive remedy, struck all parts of the complaint referring to the Ohio statute and general maritime law, and denied any right of recovery to the brother and sisters on the ground that they were not beneficiaries entitled to recovery under the Jones Act. The Court of Appeals determined that the District Court ruling was appealable. In discussing this issue, the Supreme Court stated that for a decision to be "final" does not "necessarily mean [that it is] the last order possible to be made in a case. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545" and that "the requirement of finality is to be given a 'practical rather than a technical construction.' " See 379 U.S. at 152.[2]

A decision as to the first-level tax will unquestionably be a final decision as to that tax. Applying the practical approach of the Supreme Court, that decision should be appealable. While Judge Simpson would also provide an expanded period of time during which a determination of fair market value upon which the second-level tax would be based might be made, my approach would enable the Court to retain the power to take whatever action might prove necessary to protect the foundation's interest, without relying on a party to take the initiative. In this connection, I recognize that, under either approach, it will not be possible to produce an ultimate decision which conforms precisely to the statutory scheme.[3]

---

[2]The Supreme Court was also not disturbed by the absence of a certification by the District Court under 28 U.S.C. 1292(b) as then in effect. See *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 154. See also rule 54(b), Federal Rules of Civil Procedure, which, in any event, is not applicable to this Court.

[3]I use the word "precisely" because I recognize that the problem of circuity inherent in the literal language of the statute precludes its full implementation.

SIMPSON, *J.*, dissenting: By its decision in this case, this Court has unnecessarily invalidated nine provisions of the statutes enacted by the Congress in 1969, 1974, and 1978. Due respect for the acts of Congress compels me to dissent from such a conclusion.

It is a cardinal principle of statutory construction that, whenever possible, the courts should interpret a statute so as to avoid invalidating it. Such proposition often arises in cases in which a statute is under constitutional attack. Chief Justice Hughes expressed the proposition when he said:

The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same. * * * [*N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937).]

The same doctrine was again articulated by the Supreme Court when it stated:

to construe statutes so as to avoid results glaringly absurd, has long been a judicial function. Where, as here, the language is susceptible of a construction which preserves the usefulness of the section, the judicial duty rests upon this Court to give expression to the intendment of the law. [*Armstrong Co. v. Nu-Enamel Corp.*, 305 U.S. 315, 333 (1938); fn. ref. omitted.]

Again, in *Markham v. Cabell*, 326 U.S. 404, 409 (1945), the Supreme Court declared:

The process of interpretation also misses its high function if a strict reading of a law results in the emasculation or deletion of a provision which a less literal reading would preserve.

Here, we do not have a constitutional issue; yet, the majority of the Court has chosen to adopt an interpretation of the statute which nullifies and invalidates it. Such action is contrary to the repeated judicial mandates to preserve a statute wherever possible.

In this case, there is absolutely no doubt as to the purpose of the Congress. In 1969, it enacted a system of rules regulating private foundations and certain persons dealing with them. To make such rules effective, it provided sanctions: Under section 4941, if a "disqualified person" engages in an act contrary to such rules (that is, an act of self-dealing), a 5-percent penalty is imposed on such person. However, Congress was interested in

doing more than merely punishing him for his act of self-dealing; it wanted to disgorge the benefit of such act and to make the foundation whole. S. Rept. 91–552 (1969), 1969–3 C.B. 423, 445; H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 216. To accomplish that result, it provided that if the effect of the act of self-dealing was not corrected, the person is subject to the second-level penalty of 200 percent. Obviously, no rational person would knowingly pay the second-level penalty; he would make correction of the act of self-dealing. S. Rept. 91–552 (1969), 1969–3 C.B. at 445; H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. at 213.

To carry out the plan, it was provided that if the Commissioner determines that there has been an act of self-dealing, he should send to the disqualified person a notice of deficiency for the penalties. Secs. 6211(a) and 6212(a). By filing a petition with this Court, such person would then have an opportunity to seek judicial review of whether his conduct did in fact constitute an act of self-dealing. Sec. 6213(a). Within the time for filing such petition, such person can decide whether he wishes to seek such judicial review or whether he is willing to pay the first-level penalty and correct the act of self-dealing. If he seeks judicial review by filing a petition with this Court, he is not then required to correct the act of self-dealing at that time; he can wait until the completion of judicial review of the underlying question of whether there has been an act of self-dealing. Sec. 4941(e)(4). If this Court decides that issue in his favor, he is relieved of paying any penalty.

If this Court decides that the person has engaged in an act of self-dealing, the person then has a period in which he can decide whether to seek judicial review of the decision of this Court. Sec. 7483. If he decides to accept the decision of this Court, such decision does not become final until the expiration of the period for appeal (sec. 7481(a)(1)), and he has the same period in which to avoid the second-level penalty by correcting the act of self-dealing. If he does appeal the decision of this Court, he can postpone any attempt at correcting such act; he can await the decision of the appellate court. Sec. 4941(e)(4). If the appellate court also decides the issue against him, the decision of this Court does not become final for some time (sec. 7481(a)(2)), and he has such time in which to make correction of the act of self-dealing and avoid the second-level penalty.

No doubt, the statute could have been drafted so as to

accomplish these legislative objectives more clearly. However, as the Third Circuit stated in *Berger v. Commissioner,* 404 F.2d 668, 673 (1968), affg. 48 T.C. 848 (1967), cert. denied 395 U.S. 905 (1969): "The statute * * * must be given a sensible reading which makes its provisions workable, a purpose which the draftsmen must be presumed to have intended. With this purpose in mind the meaning of the statute is readily ascertainable." I see no insurmountable problems arising from the language of the statutes. The majority concludes that since the second-level penalty is not unconditionally due at the time that the Commissioner issues his notice of deficiency, such penalty has not yet been imposed within the meaning of section 6211 and, therefore, cannot be the subject of a notice of deficiency. There is nothing to indicate that the word "imposed" was intended to mean that the penalty had become unconditionally due and owing. To the contrary, the legislative history makes it abundantly clear that such meaning was not intended. The word "imposed" appears to refer merely to the act of enacting such tax. In other words, Congress could have used the words "provided," or "established," by section 4941(b), and the effect would be the same.

The majority also believes that since it will be impossible to know whether the petitioner will be required to pay the second-level penalty at the time we enter a decision, we cannot enter a final decision in the case. Again, such a result is not compelled by the law. If, after reviewing the evidence, we conclude that the petitioner has engaged in an act of self-dealing, our decision can provide that there is due the amount of the first-level penalty. The decision can also provide that there is due the amount of the second-level penalty unless the petitioner corrects the act of self-dealing before the decision becomes final. For purposes of such decision, the amount of such penalty can be based on the value of the involved property preceding the date of decision.

There are other situations in which a deficiency determined by us may be modified by subsequent events. For example, if we decide that there is a deficiency in the personal holding company tax imposed by section 541, such deficiency may be reduced or eliminated by the subsequent payment of deficiency dividends in accordance with section 547. Similarly, if we decide there is a deficiency in the tax of a real estate investment trust, such deficiency may be modified by the subsequent payments of

deficiency dividends in accordance with section 860. A deficiency in the estate tax may also be reduced by subsequent credits of State death taxes. Sec. 2011(c)(1). Under Rule 156, Tax Court Rules of Practice and Procedure, there may be a further trial in an estate tax case to determine the amount of the expenses of an estate, and the deduction for such expenses may reduce the deficiency previously decided by this Court.

It is true that in the personal holding company provisions, in the real estate investment trust provisions, and in the estate tax provisions, the procedures for subsequent modification of a deficiency are carefully spelled out. Yet, the statutory provisions and the legislative history are equally clear in indicating that a deficiency in the tax under section 4941 may be modified by subsequent events. Furthermore, the majority does not rest its conclusion on the failure to make clear the legislative purpose. The majority seems to believe that there is an inherent requirement that a decision be unconditional. These examples serve to demonstrate that there is no such requirement; nor is there such a requirement for a decision to be considered by an appellate court. See *Fulman v. United States*, 434 U.S. 528 (1978); *Callan v. Commissioner*, 476 F.2d 509 (9th Cir. 1973), affg. per curiam 54 T.C. 1514 (1970).

Finally, the technique used by the Congress to induce self-dealers to restore the benefits to the foundation has also been used in many other situations. In 1969, such technique was used to induce the distribution of certain undistributed income by a private foundation (sec. 4942); the disposition of certain excess business holdings (sec. 4943); the removal of certain investments that jeopardize the charitable purposes of the foundation (sec. 4944); and the correction of certain taxable expenditures by a foundation (sec. 4945). When the Employee Retirement Income Security Act of 1974 (Pub. L. 93–406), 88 Stat. 829, was enacted, Congress again made use of the same technique to bring about compliance with the minimum funding standards and adherence to the investment restrictions applicable to employee plans. Secs. 4971 and 4975. In 1978, Congress turned again to such technique to bring about the correction of acts of self-dealing in connection with black lung trusts and to encourage repayment of taxable expenditures by such trusts. Secs. 4951 and 4952. Hence, when the Court nullifies the sanctions designed to encourage correction of the acts of self-dealing under section 4941, it also nullifies

the sanctions used by the Congress in connection with all these other provisions. Our decision thus has widespread consequences, and those consequences we should seek to avoid.

In this case, all that we have to decide at this time is whether the notice of deficiency is valid and what type of decision to enter in the case. It seems to me that we can answer them in a manner that carries out the undoubted legislative objectives. At this time, we need not decide precisely what is to happen when the petitioner undertakes to correct the act of self-dealing, what action the Commissioner should take in the event the petitioner fails to attempt to correct his act, or what action may be taken by the Commissioner if he wishes to claim an increase in the penalty because of increases in the value of the property involved subsequent to the entry of the initial decision and before the time it becomes final. I am altogether confident that when those questions are faced by this or other courts, reasonable answers consistent with the legislative purpose can be worked out. See *Rodgers P. Johnson Trust v. Commissioner,* 71 T.C. 941, 952 (1979), where the Court adopted a similar approach with respect to the consequences of a trust filing an agreement under section 302(c). In my judgment, it is altogether clear that we should not strike down a statute merely because we do not know precisely how it will be interpreted and applied in situations not now before us. Yet, the majority has raised doubts, and based on those doubts, concluded that the statute is unworkable.

If the charge be made that we take liberties with the statute, it may be so. Anyone should try to make it work. And we have sought the true meaning of Congress, believing it intended to make it work. [*Tenzer v. Commissioner,* 285 F.2d 956, 958 (9th Cir. 1960), revg. an unreported order of this Court.]

STERRETT, WILBUR, and CHABOT, *JJ.,* agree with this dissenting opinion.

CHABOT, *J.,* dissenting: I join in Judge Simpson's dissent. I join in so much of Judge Tannenwald's dissent as suggests an alternative way to preserve much of the statute. In addition, it should be noted that the majority have raised a further problem by effectively invalidating the scheme of section 4941. Section 4941 was enacted by section 101(b) of the Tax Reform Act of

1969 (83 Stat. 498). Section 101(j)(7) of that act (83 Stat. 527) removed private foundations from the application of the rules against self-dealing embodied in section 503 of the Code. Section 503 provided a different set of sanctions, including loss of exempt status for the organization participating in the self-dealing. The question then arises as to whether (because of the effective invalidation of the scheme of section 4941) section 503 again applies to private foundations. It appears that this question does not need to be decided in this case; however, the existence of this problem should be recognized in weighing the alternative methods of dealing with section 4941 in this case. See *Lingenfelder v. Commissioner*, 38 T.C. 44, 46 (1962).

SIMPSON, STERRETT, and WILBUR, *JJ.*, agree with this dissenting opinion.