J. P. JETER COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
J. P. Jeter Co. v. Commissioner
Docket No. 26369-90
United States Tax Court
T.C. Memo 1993-231; 1993 Tax Ct. Memo LEXIS 237; 65 T.C.M. (CCH) 2783; May 25, 1993, Filed *237 Decision will be entered under Rule 155. For petitioner: Robert B. Perry. For respondent: Audrey M. Morris. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal excise taxes under section 4971(a) and (b)[1] and additions to tax under section 6651(a) for the calendar years and in the amounts as follows: Addition to Tax
Year
Sec. 4971(a) Deficiency
Sec. 4971(b) Deficiency
Sec. 6651(a) 1983
$ 1,496.27
$ 29,925.31
$   710.73
1984
2,824.89
56,494.81
1,341.82
1985
4,045.33
80,906.64
2,021.53
1986
4,944.57
98,891.47
2,348.67
Respondent concedes that petitioner is not liable for the addition to tax under section 6651(a). The issue for decision is whether the money purchase pension plan maintained by petitioner failed to *238 meet the minimum funding standard prescribed by section 412 for the plan years 1983, 1984, 1985, and 1986, resulting in an accumulated funding deficiency, thereby causing petitioner to be liable for the excise tax under section 4971(a) and (b). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of the petition in this case, petitioner's business address was in Dallas, Texas. Petitioner began operation as a sole proprietorship in 1977 and was incorporated in 1980. The stock of petitioner is owned by Mr. Jack Jeter and his wife Ms. Cora Jeter. Because of its early financial success petitioner established pension plans, one of which was named the J. P. Jeter Company, Inc. Money Purchase Pension Plan (the plan). This plan became effective January 1, 1981. Petitioner operates a machine shop which manufactures custom machine parts. Originally, most of the items manufactured by petitioner were for use in the oil and gas industry. After the decline of the oil and gas industry during the mid-eighties, petitioner began manufacturing for other industries. When there was a decline in the drilling of oil wells in the mid-eighties, *239 petitioner lost some large contracts and began to experience cash problems. In late 1983 Mr. Jeter realized that petitioner would not be able to continue to fund the plan. Petitioner failed to make contributions to the plan for plan years after the plan year ending December 31, 1982, as required by section 412. Sometime around November 1983, Mr. Jeter discussed petitioner's inability to make contributions to the plan with the plan's actuary. The actuary told Mr. Jeter that he would take care of this problem. On September 18, 1985, petitioner requested a waiver of the funding requirements for the plan (the waiver request) under section 412(d). The waiver request was prepared by Jenkins, Hunzelman & Co., with help from Mr. Manford Edgington, petitioner's accountant. Mr. Jeter signed the waiver request declaring under penalties of perjury that to the best of his knowledge and belief the facts presented in the waiver request were true and correct. A letter dated August 23, 1985, from Mr. Manford Edgington to respondent was included as a part of the waiver request. This letter contains the following statement: "Contributions to the plan are currently anticipated to possibly resume *240 as early as 1986 plan year, but it will be more likely in plan year 1987". Also included as part of the waiver request was a Form 5500-R (Registration Statement of Employee Benefit Plan) for the plan year 1983, which was signed by Mr. Jeter on October 15, 1984. This form states that the plan was not terminated in 1983. On February 20, 1986, respondent granted petitioner a funding waiver for plan years ending December 31, 1983, and December 31, 1984, conditioned upon the plan's being revised to include certain amendments (the amendments). The amendments required to be made dealt with the payment of the waived contributions over a period of years. Petitioner never adopted the amendments. Mr. and Mrs. Jeter both spoke to Mr. Hunzelman about filing other documents for the plan. Because Mr. and Mrs. Jeter were dissatisfied with Mr. Hunzelman's handling of the plan, petitioner decided to turn the handling of the plan over to someone else. Petitioner initially chose Twylla Maddux to handle the plan and later began to use the services of Malcolm Thompson & Associates. By letter dated March 17, 1987, petitioner sent to respondent a request for a determination letter on termination *241 of the plan. Mr. Jeter requested the preparation of the letter but was not involved in its preparation. He did sign the Form 5310 "Application for Determination Upon Termination" attached to the letter on August 4, 1986. The letter requesting the determination letter states that a plan termination submission was completed in June 1986, but that no acknowledgment of respondent's receipt of the submission had been received by petitioner. The attachments to the letter requesting a determination letter with respect to termination included a copy of a resolution adopted by petitioner's board of directors on June 16, 1986, "to terminate the J. P. Jeter Company, Inc. Money Purchase Plan as of December 31, 1984". On October 21, 1987, respondent sent petitioner a determination letter stating that the proposed termination does not adversely affect the plan's qualification. This determination letter declared that it applies to the proposed termination date of June 16, 1986. The plan was formally terminated on or about June 16, 1986. At the time of trial all funds in the plan had been distributed. OPINION Section 4971(a)[2] imposes an initial excise tax on the amount of any accumulated *242 funding deficiency under a plan to which section 412 applies and 4971(b) imposes an additional tax of 100 percent on such a plan where the initial tax has been imposed and the accumulated funding deficiency has not been corrected within the taxable period. These excise taxes are to be paid by the employer responsible for making the contributions. Sec. 4971(a). Petitioner makes no argument that section 412 is not applicable to its plan. Petitioner's argument is that the plan was terminated at the end of the 1982 plan year and for that reason it was not obligated to fund the plan for 1983 and subsequent years. In D.J. Lee, M.D., Inc. v. Commissioner, 92 T.C. 291, 300 (1989), affd. 931 F.2d 418 (6th Cir. 1991), we pointed out that "The purpose of section 4971(a) is to enforce the minimum funding standards and assure that employers timely contribute sufficient funds to meet their plans' benefit obligations". In D.J. Lee, M.D., Inc. v. Commissioner, supra at 301, we quoted from H. Rept. 93-779 (1974), 1974-3 C.B. 339 and S. Rept. 93-383 (1973), 1974-3 C.B. (Supp.) 80, 103-104, *243 explaining the operation of the first (section 4971(a)) and second (section 4971(b)) tier taxes. The Senate report stated that because of the severity of the second tier tax and the fact that the employer remains liable for meeting the funding standard after the payment of the tax, it is anticipated that "few, if any, employers will willfully violate these standards". S. Rept. 93-383 (1973), 1974-3 C.B. (Supp.) 80, 103-104. *244 The first tier tax provided for in section 4971(a) is 5 percent of the amount of the accumulated funding deficiency at the end of the plan year and the second tier tax provided for in section 4971(b) is equal to 100 percent of the accumulated funding deficiency to the extent it is not corrected by the earlier of the date of mailing of the notice of deficiency or the date the first tier of tax is assessed. Sec. 4971(c)(3). [3] In order to correct the accumulated funding deficiency, a contribution must be made to the plan of the amount necessary to reduce the accumulated funding deficiency to zero. Sec. 4971(c)(2). *245 An accumulated funding deficiency is defined in section 412. [4]A plan must meet the funding requirements of section 412 until it is terminated. Petitioner argues that the plan was terminated at the end of 1982 and therefore the plan's funding requirements ceased at that time. *246 Petitioner's first argument is that the plan is terminated when an employer ceases to make payments to the plan. Petitioner cites no authority for this position. The only reference we have found to termination of plans upon discontinuance of contributions is in section 411(d)(3)(B) and section 1.411(d)(2)(i), Income Tax Regs., which refer to plans to which section 412 does not apply. Therefore there is no merit to this argument of petitioner. In fact not only did petitioner not contest the application of section 412 to its plan, Mrs. Jeter testified that petitioner was supposed to pay into the plan each year 10 percent of the salary of each employee covered by the plan. According to the regulations, a plan which is not subject to termination insurance is terminated on the date that the plan is voluntarily terminated by the employer, or employees, maintaining the plan. Sec. 1.411(d)-2(c)(3), Income Tax Regs. Exactly when a voluntary termination takes place is a question of fact. Sec. 1.401-6(b)(1), Income Tax Regs.
Based on the record in this case, we have determined that the plan was not terminated at the end of 1982 or in 1983, but was terminated later around June 16, 1986. *247 This record shows that: (1) Form 5500-R for the plan year 1983 states that the plan was not terminated in 1983; (2) the waiver request stated that petitioner expected to begin contributing to the plan again in 1986 or 1987; (3) there is no evidence of notice of termination being sent to any of the plan participants; and finally (4) the resolution by petitioner's board of directors to terminate the plan was not passed until June 16, 1986. The evidence presented does not show that petitioner desired or intended to terminate the plan in 1983. The evidence establishes that Mr. and Mrs. Jeter realized that petitioner would not be able to make the plan contributions for 1983 and discussed with the plan experts what could be done to solve this problem. The plan experts told them that this problem would be handled. In September 1985, the experts drew up and Mr. Jeter signed a waiver request. Only later was it determined that petitioner would not be able to begin to contribute to the plan again and it was then decided that the plan should be terminated. Therefore, the plan was responsible for meeting the funding requirements of section 412 during 1983, 1984, 1985, and until June 16, *248 1986. In reaching our conclusion, we have considered the testimony of both Mr. and Mrs. Jeter to the effect that they told petitioner's plan experts that they wanted the plan "stopped". Mr. Jeter was unable to explain what he meant by "stopped". He could not explain statements he signed under penalties of perjury that conflicted with a termination of the plan. Mrs. Jeter testified that she thought "waiver" meant that the plan was "stopped". Neither Mr. nor Mrs. Jeter could explain their continuing to discuss the plan with the "experts" if they thought the plan had been terminated. Also, there were many questions about their activities with respect to petitioner's plan that both Mr. and Mrs. Jeter answered "I can't remember". The conclusion we reach from the testimony of Mr. and Mrs. Jeter is that neither of them understood the operation of the plan nor petitioner's obligation under the plan. In D.J. Lee, M.D., Inc. v. Commissioner, supra at 302, we held that the imposition of the excise tax under section 4971(a) does not depend on the taxpayer's intent to violate the minimum funding standards of section 412. As the conference committee stated *249 in its report: If there is an accumulated funding deficiency, an excise tax is to be imposed on the employer who is responsible for making contributions to the plan. [H. Conf. Rept. 93-1280, 1974-3 C.B. 415, 445.]
This statement implies that the imposition of the excise tax under section 4971 is automatic if there is a funding deficiency. One way to avoid the excise tax is by receiving a waiver of funding for a particular year or years. S. Rept. 93-383 (1974), 1974-3 C.B. (Supp.) 80, 104. Petitioner requested a waiver and it was granted conditioned upon the adoption by the plan of the amendments with respect to paying the amount later over a period of years. Since the amendments were never adopted, the waiver was never valid. Petitioner made no contributions to the plan for 1983, 1984, 1985, or 1986. Since the plan was in existence during those years and no contributions were made, an accumulated funding deficiency existed for each of those years and petitioner is liable for the first tier of the excise tax under section 4971(a). As to the second tier of the excise tax under section 4971(b), the notice of deficiency *250 was mailed September 10, 1990. The evidence is clear that petitioner had not at the date of trial made contributions to the plan in order to correct the accumulated funding deficiencies. We do not know whether petitioner has chosen to correct the funding deficiency since the trial, but we have received no information that it has. Therefore, we sustain respondent's determination of the second tier of the excise tax imposed under section 4971(b). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. SEC. 4971. TAXES ON FAILURE TO MEET MINIMUM FUNDING STANDARDS. (a) INITIAL TAX. -- For each taxable year of an employer who maintains a plan to which section 412 applies, there is hereby imposed a tax of 5 percent on the amount of the accumulated funding deficiency under the plan, determined as of the end of the plan year ending with or within such taxable year. The tax imposed by this subsection shall be paid by the employer responsible for contributing to or under the plan the amount described in section 412(b)(3)(A). (b) ADDITIONAL TAX. -- In any case in which an initial tax is imposed by subsection (a) on an accumulated funding deficiency and such accumulated funding deficiency is not corrected within the taxable period, there is hereby imposed a tax equal to 100 percent of such accumulated funding deficiency to the extent not corrected. The tax imposed by this subsection shall be paid by the employer described in subsection (a). (c) DEFINITIONS. -- For purposes of this section -- (1) ACCUMULATED FUNDING DEFICIENCY. -- The term "accumulated funding deficiency" has the meaning given to such term by the last two sentences of section 412(a). (2) CORRECT. -- The term "correct" means, with respect to an accumulated funding deficiency, the contribution, to or under the plan, of the amount necessary to reduce such accumulated funding deficiency as of the end of a plan year in which such deficiency arose to zero. (3) TAXABLE PERIOD. -- The term "taxable period" means, with respect to an accumulated funding deficiency, the period beginning with the end of a plan year in which there is an accumulated funding deficiency and ending on the earlier of -- (A) the date of mailing of a notice of deficiency with respect to the tax imposed by subsection (a), or (B) the date on which the tax imposed by subsection (a) is assessed.↩
3. Prior to its amendment by Pub. L. 96-596, 94 Stat. 3464 (1980), 1980-2 C.B. 653, sec. 4971(c)(3) provided that the period in which correction of the funding deficiency could be made was 90 days after the mailing of the notice of deficiency extended by any period in which the deficiency could not be assessed and any other period which the respondent determined reasonable and necessary.
In Adams v. Commissioner, 72 T.C. 81, 85 (1979), we held that because of a provision of sec. 4941(b)(4), comparable to that of sec. 4971(c)(3) prior to its amendment, there was no deficiency to be determined or redetermined. The opinion in the Adams case led to the amendment not only of sec. 4971(b)(4) to read as it now does, but also to the amendment of sec. 4971(c)(3) to read as it now does. We have recognized that since the amendments we have the jurisdiction to redetermine the second tier deficiency and we have in appropriate cases determined a second tier deficiency. See Zabolotny v. Commissioner, 97 T.C. 385 (1991); Hockaden & Associates, Inc. v. Commissioner, 84 T.C. 13 (1985); Howell v. Commissioner, 77 T.C. 916 (1981), affd. without published opinion 688 F.2d 815↩ (2d Cir. 1987). However, under the provisions of sec. 4963, the second tier tax may still be avoided by correction of the accumulated funding deficiency after an opinion by this Court has been filed and even after a decision has been entered. See also secs. 4961 and 4962.
4. SEC. 412. MINIMUM FUNDING STANDARDS. (a) GENERAL RULE. -- Except as provided in subsection (h), this section applies to a plan if, for any plan year beginning on or after the effective date of this section for such plan -- (1) such plan included a trust which qualified (or was determined by the Secretary to have qualified) under section 401(a), or (2) such plan satisfied (or was determined by the Secretary to have satisfied) the requirements of section 403(a).
A plan to which this section applies shall have satisfied the minimum funding standard for such plan for a plan year if as of the end of such plan year, the plan does not have an accumulated funding deficiency. For purposes of this section and section 4971, the term "accumulated funding deficiency" means for any plan the excess of the total charges to the funding standard account for all plan years (beginning with the first plan year to which this section applies) over the total credits to such account for such years or, if less, the excess of the total charges to the alternative minimum funding standard account for such plan years over the total credits to such account for such years. In any plan year in which a multiemployer plan is in reorganization, the accumulated funding deficiency of the plan shall be determined under section 418B. (b) FUNDING STANDARD ACCOUNT. -- (1) ACCOUNT REQUIRED. -- Each plan to which this section applies shall establish and maintain a funding standard account. Such account shall be credited and charged solely as provided in this section. (2) CHARGES TO ACCOUNT. -- For a plan year, the funding standard account shall be charged with the sum of -- (A) the normal cost of the plan for the plan year, (B) the amounts necessary to amortize in equal annual installments (until fully amortized) -- * * * (3) CREDITS TO ACCOUNT. -- For a plan year, the funding standard account shall be credited with the sum of -- (A) the amount considered contributed by the employer to or under the plan for the plan year, (B) the amount necessary to amortize in equal annual installments (until fully amortized) -- * * *
(d) VARIANCE FROM MINIMUM FUNDING STANDARD. -- (1) WAIVER IN CASE OF SUBSTANTIAL BUSINESS HARDSHIP. -- If an employer or in the case of a multiemployer plan, 10 percent or more of the number of employers contributing to or under the plan, are unable to satisfy the minimum funding standard for a plan year without substantial business hardship and if application of the standard would be adverse to the interests of plan participants in the aggregate, the Secretary may waive the requirements of subsection (a) for such year with respect to all or any portion of the minimum funding standard other than the portion thereof determined under subsection (b)(2)(C). The Secretary shall not waive the minimum funding standard with respect to a plan for more than 5 of any 15 consecutive plan years. (2) DETERMINATION OF SUBSTANTIAL BUSINESS HARDSHIP. -- For purposes of this section, the factors taken into account in determining substantial business hardship shall include (but shall not be limited to) whether or not -- (A) the employer is operating at an economic loss, (B) there is substantial unemployment or underemployment in the trade or business and in the industry concerned, (C) the sales and profits of the industry concerned are depressed or declining, and (D) it is reasonable to expect that the plan will be continued only if the waiver is granted. (3) WAIVED FUNDING DEFICIENCY. -- For purposes of this section, the term "waived funding deficiency" means the portion of the minimum funding standard (determined without regard to subsection (b)(3)(C)) for a plan year waived by the Secretary and not satisfied by employer contributions.↩